# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2019-NMSC-013

Filing Date: June 28, 2019

NO. S-1-SC-34372

**ROBERT FRY,**

Petitioner-Appellant,

v.

**JAMES LOPEZ, Warden,
PENITENTIARY OF NEW MEXICO,**

Respondent-Appellee,

and

NO. S-1-SC-34386

**TIMOTHY C. ALLEN,**

Petitioner-Appellant,

v.

**TIM LEMASTER, Warden,**

Respondent-Appellee.

**INTERLOCUTORY APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY
Karen L. Townsend, District Judge**

Released for Publication September 17, 2019.

McGarry Law Office
Kathleen McGarry
Glorieta, NM

Jacquelyn Robins
Albuquerque, NM

for Appellant Robert Fry

Melissa Hill
Corrales, NM

Ray Twohig
Albuquerque, NM

for Appellant Timothy C. Allen

Hector H. Balderas, Attorney General
M. Victoria Wilson, Assistant Attorney General
Santa Fe, NM

for Appellees James Lopez and Tim LeMaster

UNM School of Law
George L. Bach, Jr.
Albuquerque, NM

for Amicus Curiae Professors at University of New Mexico School of Law

The Law Office of Jamison Barkley, LLC
Jamison Barkley
Santa Fe, NM

The Law Office of John Day, LLC
John W. Day
Santa Fe, NM

UNM School of Law
Barbara E. Bergman
Albuquerque, NM

Jones, Snead, Wertheim & Clifford, P.A.
Jerry Todd Wertheim
Santa Fe, NM

for Amicus Curiae New Mexico Criminal Defense Lawyers Association

## OPINION

**VIGIL, Justice.**

## I.    INTRODUCTION

{1}    In this case we revisit our statutory responsibility to ensure that the death penalty is reserved for the most heinous crimes. Since 1979, the New Mexico Legislature has

directed this Court to ensure that "the death penalty shall not be imposed if . . . the sentence of death is excessive or disproportionate to the penalty imposed in similar cases." NMSA 1978, § 31-20A-4(C)(4) (1979, repealed 2009).

**{2}** In 2009, the Legislature abolished the death penalty as a sentencing option for murders committed after July 1, 2009.[1] Today, Petitioners Robert Fry and Timothy Allen, who committed their crimes before 2009, are the last inmates who remain on death row in New Mexico. Fry and Allen filed Petitions for Writs of Habeas Corpus seeking to dismiss their death sentences in light of the prospective-only application of the repeal.

**{3}** In this consolidated appeal of the district court's denial of Petitioners' motions to dismiss their death sentences, we hold that Petitioners' death sentences are disproportionate and violate Section 31-20A-4(C)(4). Guided by our recognition that our Legislature intended for comparative proportionality review to protect against the arbitrary imposition of the death penalty, we conclude that there is no meaningful basis for distinguishing Fry and Allen from the many similar cases in which the death penalty was not imposed. Because Petitioners' death sentences are statutorily disproportionate to the penalties imposed in similar cases, we remand each case to the district court to impose a sentence of life imprisonment.

## II. BACKGROUND AND PROCEDURAL HISTORY

**{4}** Prior to the 2009 statutory repeal of the death penalty, Petitioners Fry and Allen were sentenced to death. Allen was convicted of first-degree murder for the 1994 killing of a seventeen-year-old girl. *State v. Allen*, 2000-NMSC-002, ¶¶ 2, 15, 128 N.M. 482, 994 P.2d 728. Her body was found roughly three miles north of Flora Vista, partially undressed with a rope wrapped tightly around her neck. *Id.* ¶¶ 3-4, 6. Investigators testified that the condition of her clothing was consistent with sexual assault and that the cause of death was ligature strangulation. *Id.* ¶¶ 5-6. Allen was also convicted of the noncapital offenses of kidnapping and attempted criminal sexual penetration, for which he was sentenced to imprisonment. *Id.* ¶ 15.

**{5}** In accordance with the Capital Felony Sentencing Act, Allen's sentence for murder was determined in a separate proceeding. *Id.* ¶¶ 1, 15; *see* NMSA 1978, § 31-20A-1(B) (1979, repealed 2009). At sentencing, Allen's jury found the aggravating circumstances of kidnapping and murder of a witness and unanimously voted to impose the death penalty. *Allen*, 2000-NMSC-002, ¶ 15; *see* NMSA 1978, § 31-20A-3 (1979, repealed 2009). Allen appealed his convictions and sentence which were affirmed by this Court. *Allen*, 2000-NMSC-002, ¶ 118. He appeals now to this Court from his ongoing pursuit of state habeas corpus claims in district court.

**{6}** On June 9, 2000, Fry and an accomplice kidnapped a woman who was stranded at a convenience store. *State v. Fry*, 2006-NMSC-001, ¶¶ 3-4, 138 N.M. 700, 126 P.3d

[1]H.B. 285, 49th Leg., 1st Sess., Section 6 (N.M. 2009), *available at* https://www.nmlegis.gov/sessions/09%20Regular/final/HB0285.pdf (last visited June 4, 2019).

516. In the course of an attempted sexual assault, Fry stabbed the woman in the chest, penetrating her breastbone, but not piercing her heart. *Id.* ¶ 4. She tried to run away, but Fry caught her and hit her in the back of the head with a sledgehammer, killing her. *Id.* Fry's accomplice testified against Fry after pleading guilty to first-degree murder and kidnapping. *Id.* ¶ 6. Fry was convicted of first-degree murder, kidnapping, attempted criminal sexual penetration, and tampering with evidence. *Id.* ¶ 1. Fry's jury found the aggravating circumstance of kidnapping and sentenced him to death. *Id.* ¶ 6. Fry appealed his conviction and sentence and was denied relief. *Id.* ¶¶ 1, 64. Like Allen, Fry now appeals to this Court from his ongoing litigation of state habeas corpus claims in district court.

**{7}**     On direct appeal to this Court, both Fry and Allen argued that their death sentences were disproportionate to the penalties imposed in similar cases and therefore violated Section 31-20A-4(C)(4). *Fry*, 2006-NMSC-001, ¶¶ 42-45; *Allen*, 2000-NMSC-002, ¶¶ 111-12. We rejected their arguments and affirmed the proportionality of both sentences. *Fry*, 2006-NMSC-001, ¶ 44; *Allen*, 2000-NMSC-002, ¶ 111. In doing so, we relied on the proportionality test adopted by a divided Court in *State v. Garcia*, 1983-NMSC-008, ¶ 34, 99 N.M. 771, 664 P.2d 969.

**{8}**     Petitioners' cases were in postconviction habeas proceedings when the Legislature repealed the death penalty effective July 1, 2009. Following the repeal, Fry and Allen filed motions to dismiss their death sentences, arguing that the repeal rendered their death sentences unconstitutional. Fry and Allen asserted that the prospective-only application of the repeal violated state and federal prohibitions against cruel and unusual punishment, state and federal guarantees of equal protection, and the prohibition of special laws in the New Mexico Constitution. The district court denied Petitioners' motions and concluded that the death sentences were constitutional. However, it granted Petitioners' requests for an interlocutory appeal and stayed their executions pending the outcome of the interlocutory appeal.

**{9}**     We granted Petitioners' applications for interlocutory appeal. Because "[w]e seek to avoid an interpretation of a statute that would raise constitutional concerns," this Court asked for supplemental briefing on the statutory validity of Petitioners' death sentences. *See State v. Pangaea Cinema*, 2013-NMSC-044, ¶ 18, 310 P.3d 604 (internal quotation marks and citation omitted). Specifically, this Court asked whether it should reconsider its approach to assessing the comparative proportionality of a death sentence under Section 31-20A-4(C)(4).

## III.     JURISDICTION AND STANDARD OF REVIEW

**{10}**   By statute and under Article VI, Section 2 of the New Mexico Constitution, this Court has "exclusive jurisdiction over interlocutory appeals in criminal cases where a defendant faces possible life imprisonment or execution." *State v. Ameer*, 2018-NMSC-030, ¶ 8, ___ P.3d ___; *see also* NMSA 1978, § 39-3-3(A)(3) (1972). In addition, we have the exclusive statutory responsibility to ensure that a death sentence is not

disproportionate to the penalty imposed in similar cases. *See* § 31-20A-4(C)(4); *State v. Wyrostek*, 1994-NMSC-042, ¶ 10, 117 N.M. 514, 873 P.2d 260.

**{11}**    Our role in reviewing a death sentence is not to question the wisdom of the repeal nor to insert our own policy judgment in place of the Legislature's. As Justice Franchini wrote, "this Court is powerless"—despite practical or philosophical opposition to the death penalty—"to change [public policy] unless the statutory law underlying the policy is declared unconstitutional." *State v. Clark*, 1999-NMSC-035, ¶ 94, 128 N.M. 119, 990 P.2d 793 (Franchini, J., specially concurring). We are obligated "to interpret and apply the law to the facts of a case free of any personal or philosophical leanings." *Id.* ¶ 96.

**{12}**    We review statutory and constitutional challenges de novo. *Ameer*, 2018-NMSC-030, ¶ 9. Our review of Petitioners' death sentences is guided by the promises of the United States Constitution and New Mexico Legislature. We recognize that each Petitioner "is guilty of shocking crimes that well may merit forfeiture of his life." *Clark v. Tansy*, 1994-NMSC-098, ¶ 3, 118 N.M. 486, 882 P.2d 527. Nonetheless, "[l]aw triumphs when the natural impulses aroused by a shocking crime yield to the safeguards which our civilization has evolved for an administration of criminal justice at once rational and effective." *Id.* (alteration in original) (internal quotation marks and citation omitted).

## IV.    DISCUSSION

**{13}**    Because the purpose of comparative proportionality review is most clear from its history, we begin with the origin of comparative proportionality review. In the 1970s, the United States Supreme Court decided a series of landmark cases concerning the constitutionality of capital punishment, which in turn impacted whether and how states could impose the death penalty. *See generally Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam) (holding capital sentencing schemes unconstitutional as applied due to lack of procedures guarding against the arbitrary imposition of the death penalty); *Gregg v. Georgia*, 428 U.S. 153 (1976) (upholding a revised capital punishment scheme because it contained procedures to guard against the arbitrary and capricious imposition of the death penalty, including comparative proportionality review). It was against this constitutional backdrop that the New Mexico Legislature adopted the comparative proportionality requirement. Section 31-20A-4(C)(4).

**{14}**    The first of the landmark federal cases concerning the death penalty was *Furman*, 408 U.S. 238. In *Furman*, the Supreme Court held that the Eighth and Fourteenth Amendments prohibited capital sentencing schemes that gave unfettered discretion to judges and juries in deciding whether to impose a death sentence. *See generally id.* Although each of the nine justices wrote separately, the five concurring justices were united in their concern that capital punishment was being dealt out arbitrarily. *See, e.g., id.* at 295 (Brennan, J., concurring) ("The probability of arbitrariness is sufficiently substantial that it can be relied upon, in combination with the other principles, in reaching a judgment on the constitutionality of this punishment."). *Furman* put a temporary moratorium on the imposition of the death penalty, although it

did not hold the death penalty to be under all circumstances cruel and unusual punishment. New Mexico, like every other state, was precluded from imposing the death penalty until a revised capital sentencing scheme could be passed by our Legislature.

**{15}** The *Furman* Court expressed concern with disproportionate sentencing. Justice White observed, "the death penalty is exacted with great infrequency even for the most atrocious crimes," and "there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Id.* at 313 (White, J., concurring). "No one has yet suggested a rational basis that could differentiate in those terms the few who die from the many who go to prison. . . . [O]ur procedures are not constructed to guard against the totally capricious selection of criminals for the punishment of death." *Id.* at 294-95 (Brennan, J., concurring). In the view of the *Furman* Court, the rare imposition of the death penalty, combined with the lack of procedural safeguards governing the selection of who should face death, rendered the death penalty

> cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders . . . , many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed. . . . [T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed.

*Id.* at 309-10 (Stewart, J., concurring) (footnote omitted). In other words, the existing capital sentencing schemes provided no assurance that the death penalty was being consistently imposed on the worst offenders. *See id.* at 293-95 (Brennan, J., concurring).

**{16}** In the aftermath of *Furman*, New Mexico took the path of many other states and enacted a mandatory capital sentencing scheme, "apparently on the theory that if there was no discretion, there was no problem."[2] However, the Supreme Court declared mandatory sentencing schemes to be unconstitutional in *Woodson v. North Carolina*, 428 U.S. 280 (1976); *see State v. Rondeau*, 1976-NMSC-044, ¶¶ 9, 50, 89 N.M. 408, 553 P.2d 688.

**{17}** Four years after *Furman*, the Supreme Court upheld a revised capital sentencing scheme in *Gregg*, 428 U.S. at 196-99. Georgia's revised capital sentencing scheme included procedures intended to guard against the arbitrary imposition of the death penalty, including mandatory appellate review and statutorily-defined aggravating circumstances narrowing the class of offenders eligible for the death penalty. *Id.* at 166-67, 197-98. Significantly, Georgia directed its state supreme court to conduct an

---

[2]Marcia J. Wilson, *The Application of the Death Penalty in New Mexico, July 1979 Through December 2007: An Empirical Analysis*, 38 N.M. L. Rev. 255, 255 (2008); NMSA 1953, § 40A-29-2 (1975); *see also Gregg*, 428 U.S. at 179-81 n.23.

automatic comparative proportionality review of every death sentence. *Id.* at 166-67, 204-05. The *Gregg* Court described the purpose of this review as to

> substantially eliminate[] the possibility that a person will be sentenced to die by the action of an aberrant jury. If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death.

*Id.* at 206. The *Gregg* Court held that these procedures together alleviated the concerns expressed in *Furman*, enabling states to proceed with the death penalty provided they adopted similar procedural protections. *Gregg*, 428 U.S. at 166-67, 169.

**{18}** New Mexico adopted the Capital Felony Sentencing Act, complete with procedures modeled on the Georgia scheme, in 1979. *Compare* NMSA 1978, §§ 31-20A-1 to -6 (1979), *with Gregg*, 428 U.S. at 162-63, 197-98 (describing the Georgia statute); *see also* Wilson, *supra*, at 257. Like Georgia, New Mexico provided for automatic appellate review of all death sentences and mandatory comparative proportionality review. *Compare Gregg*, 428 U.S. at 197-98, *with* Section 31-20A-4. Under Section 31-20A-4,

> A. The judgment of conviction and sentence of death shall be automatically reviewed by the supreme court of the state of New Mexico.
>
> B.  In addition to the other matters on appeal, the supreme court shall rule on the validity of the death sentence.
>
> C.  The death penalty shall not be imposed if:
>
> > (1)  the evidence does not support the finding of a statutory aggravating circumstance;
> >
> > (2) the evidence supports a finding that the mitigating circumstances outweigh the aggravating circumstances;
> >
> > (3)  the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; or
> >
> > (4)  *the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.*

(Emphasis added.) Section 31-20A-4(C)(4) is the basis for the comparative proportionality requirement at issue in this appeal.

**{19}**     New Mexico also narrowed the class of offenders eligible for the death penalty to those guilty of first-degree murder where the sentencing jury unanimously finds one of seven aggravating circumstances: murder for hire; murder of a witness; murder of a police officer; murder in the commission of or attempt to commit a kidnapping, criminal sexual contact of a minor, or criminal sexual penetration; murder in an attempt to escape a penal institution; murder of an employee of the corrections department by an inmate of the corrections department; and murder of a fellow inmate or person lawfully on the premises of a penal institution. Section 31-20A-3; *see also* NMSA 1978, § 31-20A-5(A)-(G) (1981). New Mexico's revised capital sentencing scheme remained largely unchanged from 1979 until the 2009 repeal and remains in force for murders committed before 2009 pursuant to the Legislature's savings clause. H.B. 285, 49th Leg., 1st Sess., Section 6. Based on its similarities to the Georgia statute, we interpret our scheme as incorporating the principles announced in *Furman* and *Gregg. See Garcia*, 1983-NMSC-008, ¶¶ 23-25 (citing *Furman* and *Gregg* and comparing the New Mexico capital sentencing statutes to the Georgia code); *see also State v. Addison*, 737 A.3d 1225, 1239 (N.H. 2010) (concluding that a similar comparative proportionality review requirement was "intended to incorporate the then-existing jurisprudential background of the United States Supreme Court").

**{20}**     The United States Supreme Court clarified in *Pulley v. Harris* that comparative proportionality review is not constitutionally required. 465 U.S. 37, 45 (1984). However, it did not undermine the importance of comparative proportionality review for those states that chose to incorporate comparative proportionality review as a mandatory component of the capital sentencing scheme. *Id.* at 44-45. *Pulley* describes comparative proportionality review as a post-sentence inquiry into whether a death sentence is "disproportionate to the punishment imposed on others convicted of the same crime." *Id.* at 43. Accordingly, this Court must determine whether a defendant is being arbitrarily "singled out" for the death penalty when compared to factually similar crimes. *State v. Papasavvas*, 790 A.2d 798, 800 (N.J. 2002) (per curiam).

**{21}**     *Pulley* also clarified that comparative proportionality is different from traditional proportionality review, which is the "abstract evaluation of the appropriateness of a sentence for a particular crime." 465 U.S. at 42-43. Traditional proportionality review is meant to ensure that a punishment fits the crime. *Id.* at 43 ("Looking to the gravity of the offense and the severity of the penalty, [and] to sentences imposed for other crimes, . . . this Court has occasionally struck down punishments as *inherently* disproportionate, and therefore cruel and unusual, when imposed for a particular crime or category of crime." (emphasis added)). By contrast, for comparative proportionality review, the presumption is that the death penalty "is not disproportionate to the crime in the traditional sense." *Id.*; *see also Gregg*, 428 U.S. at 187 ("[W]hen a life has been taken deliberately by the offender, we cannot say that the punishment is invariably disproportionate to the crime. It is an extreme sanction, suitable to the most extreme of crimes." (footnote omitted)). Instead, the question is "whether the penalty is nonetheless unacceptable . . . because [it is] disproportionate to the punishment imposed on others convicted of the same crime." *Pulley*, 465 U.S. at 43.

**{22}** Prior to *Pulley*, this Court adopted the existing approach to comparative proportionality review. *Garcia*, 1983-NMSC-008, ¶ 34. Interpreting Section 31-20A-4(C)(4), the majority stated:

> We assume that the Legislature means that in similar cases, considering both the crime and defendant, a defendant convicted of first degree murder under a specific aggravated circumstance should not be put to death if another defendant or other defendants, convicted of murder under the same aggravated circumstance is given life imprisonment, unless there is some justification. Therefore, we adopt the following guidelines for review under this Section.
>
> 1. We will review this issue only when raised on appeal.
>
> 2. In our review, we will consider only New Mexico cases in which a defendant has been convicted of capital murder under the *same aggravating circumstance(s)*.
>
> 3. Only those New Mexico cases in which a defendant was convicted under the same aggravating circumstance(s) and then received *either* the death penalty *or* life imprisonment and whose conviction and sentence have been upheld previously by this Court[] will be considered appropriate for comparison.
>
> 4. We will review the record and compare the facts of the offense and all other evidence presented by way of aggravation or mitigation to determine whether the sentence is excessive or disproportionate.

*Garcia*, 1983-NMSC-008, ¶ 34 (footnote omitted). Under the *Garcia* approach to comparative proportionality review, we compare a death sentence to cases involving the same aggravating circumstance, where a defendant received a sentence of either life or death, and which were affirmed on appeal. *Id.* The *Garcia* majority also professed that "[i]n our duty to review the determination by the jury, we will not retry the case for what may be a better result." *Id.* ¶ 40 (emphasis omitted).

**{23}** Justice Sosa dissented from the imposition of the death penalty, foreshadowing the issues that are now before this Court. *Id.* ¶¶ 43, 65 (Sosa, J., specially concurring). Among his concerns, Justice Sosa noted that the majority had not acknowledged the mandatory nature of comparative proportionality review. *Id.* ¶¶ 59, 61. He further noted that the statute failed to specify the relevant universe of cases. *Id.* ¶ 59. "What does similar mean?" he asked, and

> [h]ow far back in New Mexico's judicial history should comparisons be made? Should extrajudicial cases be brought into the analysis? Are cases which ended in plea bargains relevant? If a prosecutor exercises

discretion in the charging process and seeks an indictment without aggravating circumstances, is that case similar?

*Id.* In the view of Justice Sosa, these failures prevented this Court from conducting a meaningful review of whether a death sentence was arbitrary and rendered New Mexico's capital sentencing scheme unconstitutional. *Id.* ¶¶ 63-65.

**{24}** In this case, Fry and Allen argue that this Court should overrule *Garcia* and expand the universe of cases used in determining whether a sentence is disproportionate under Section 31-20A-4(C)(4). In the alternative, Fry and Allen argue that this Court should find their sentences disproportionate under the *Garcia* approach to comparative proportionality review. We address their arguments in accordance with the Legislature's mandate in Section 31-20A-4(C)(4) that we conduct a comparative proportionality review in order to provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Furman*, 408 U.S. at 313 (White, J., concurring). We also address the State's assertion that principles of finality and stare decisis counsel against overruling *Garcia*.

A.      **The Legislature's Repeal of the Death Penalty Is a Compelling Reason to Revisit the Comparative Proportionality of Petitioners' Death Sentences**

**{25}** The State argues that we should refrain from revisiting the comparative proportionality of Petitioners' death sentences because we determined that the death sentences were not excessive or disproportionate in their direct appeals. *Fry*, 2006-NMSC-001, ¶¶ 42-45; *Allen*, 2000-NMSC-002, ¶ 111. We exercise our discretion to reconsider the proportionality of Petitioners' death sentences in light of the extraordinary circumstances created by the death penalty repeal.

**{26}** Because the essential purpose of habeas review is to reconsider and correct issues that were wrongly decided on direct appeal, "courts rarely apply principles of finality in habeas corpus proceedings with the same force as they do in ordinary litigation." *Clark v. Tansy*, 1994-NMSC-098, ¶¶ 12, 14. "Historically the writ of habeas corpus has been used to protect individual rights from erroneous deprivation." *Id.* ¶ 12. This Court has the discretion to reconsider issues disposed of on direct appeal in cases (1) involving an intervening change in law, (2) involving an intervening change in fact, or (3) where "the ends of justice would otherwise be served." *Id.* ¶ 14. Here, all three are satisfied.

**{27}** The State argues that the repeal was not technically a change in law because it left the comparative proportionality requirement undisturbed for murders committed before July 1, 2009.[3] *Id.* ¶ 14. We disagree. The repeal represents a profound change in

---

[3]The repeal must be read as leaving the statutory proportionality requirement and constitutionally required protections undisturbed for murders committed prior to July 1, 2009. This is due to the savings clause, Section 6 of H.B. 285, 49th Leg., 1st Sess., and because the procedures afforded under the pre-repeal, 1979 capital sentencing scheme were constitutionally mandated components of a capital sentencing scheme. *Pulley*, 465 U.S. at 50 (noting that the constitutionality of a capital sentencing scheme rests on the statutory limitation of the death penalty to

the legislative attitude toward the death penalty and a shift in the standards of decency. *State v. Santiago*, 122 A.3d 1, 62 (Conn. 2015) ("The prospective abolition of the death penalty . . . provides strong support for the conclusion that capital punishment no longer comports with contemporary standards of decency.").

**{28}** The repeal of the death penalty is also an intervening change in fact, presenting eminently relevant information that was not considered upon our initial review of Petitioners' death sentences. In determining the proper course of action, this Court is not limited to considering the instant record but rather "may take judicial notice of legislative facts by resorting to whatever materials it may have at its disposal establishing or tending to establish those facts." *Kerr v. Parsons*, 2016-NMSC-028, ¶ 6, 378 P.3d 1 (internal quotation marks and citation omitted); *see also Lee v. Martinez*, 2004-NMSC-027, ¶ 13, 136 N.M. 166, 96 P.3d 291 ("Legislative facts are those which help the tribunal to determine the content of law and policy and to exercise its judgment or discretion in determining what course of action to take." (internal quotation marks and citation omitted)). While we have long known that the death penalty was imposed with great infrequency, we now know that only one person was executed in New Mexico under the 1979 capital sentencing scheme. *See* Wilson, *supra*, at 266. The repeal effectively sealed the universe of cases for proportionality review, enabling us to conduct a more meaningful comparison of Petitioners' death sentences to the sentences imposed in similar cases. "[C]ourts should not impede postconviction litigation that will provide necessary fuller or fairer procedural opportunities to examine alleged constitutional defects when consideration of an issue on direct appeal is based upon facts which could not, or customarily would not, be developed at trial." *Duncan v. Kerby*, 1993-NMSC-011, ¶ 6, 115 N.M. 344, 851 P.2d 466.

**{29}** Fry and Allen are currently the only two inmates facing the death penalty under the 1979 capital sentencing scheme and, due to the repeal's profound shift in fact and law, they are likely to be the last two inmates to ever face the death penalty under that statutory framework. The interests of justice require us to ensure that every person facing death under the 1979 capital sentencing scheme is afforded its full statutory protections. Under that capital sentencing scheme, we have an unqualified mandate to assure that a death sentence shall not be imposed if disproportionate to the penalty imposed in similar cases. Section 31-20A-4(B), (C)(4) (providing that "the supreme court *shall* rule on the validity of the death sentence" and that "[t]he death penalty shall not be imposed if . . . disproportionate to the penalty imposed in similar cases"); *see* NMSA 1978, § 12-2A-4(A) (1997) (" 'Shall' . . . express[es] a duty, obligation, requirement or condition precedent."). This is a heightened, additional, and continuing responsibility, and it is a mandatory and important component of New Mexico's capital sentencing scheme. Until an execution is carried out, justice requires us to ensure that a death sentence is not disproportionate.

**{30}** Our reconsideration of the proportionality of Petitioners' death sentences is consistent with the highest level of scrutiny which death penalty cases demand. *Gregg*,

---

offenses involving a statutorily defined aggravating circumstance); *see also Pangaea Cinema*, 2013-NMSC-044, ¶ 23 (prescribing avoidance of a conclusion of, or an allusion to, unconstitutionality in the construction of statutes).

428 U.S. at 187 ("When a defendant's life is as stake, the Court has been particularly sensitive to insure that every safeguard is observed."); *State v. Chadwick-McNally*, 2018-NMSC-018, ¶ 2, 414 P.3d 326 ("The extraordinary penalty of death demands heightened scrutiny of its imposition." (quoting *State v. Frank Martinez*, 2002-NMSC-008, ¶ 8, 132 N.M. 32, 43 P.3d 1042)); *Clark v. Tansy*, 1994-NMSC-098, ¶ 9 ("[T]his Court believes that death indeed is different from other sanctions and thus requires greater scrutiny."); *Woo Dak San v. State*, 1931-NMSC-056, ¶ 2, 36 N.M. 53, 7 P.2d 940 ("[T]he alien and friendless condition of the condemned man, the devoted services of his counsel, serving by appointment, the importance of the case and of the questions involved . . . call for the most deliberate judgment and considerate procedure at all stages."). This is due to the "gravity and irrevocability of the death sentence" as well as the extraordinary risk of an erroneous execution. *Frank Martinez*, 2002-NMSC-008, ¶¶ 8, 10 ("Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." (internal quotation marks and citation omitted)). Because of the "grave injustice" presented by an erroneous execution, *id.* ¶ 10, additional safeguards are required to prevent the arbitrary imposition of a death sentence. *Gregg*, 428 U.S. at 187.

**{31}** While there is a legitimate interest in the finality of criminal judgments, the repeal of the death penalty presents a profound change in the legal and factual framework surrounding Petitioners' death sentences such that the interests of justice require that we ensure that those sentences are not disproportionate to the penalty imposed in similar cases. We therefore exercise our discretion to reconsider the comparative proportionality of Petitioners' death sentences.

**B.     Our Prior Application of *Garcia* Did Not Substantially Eliminate the Risk of an Arbitrary and Capricious Death Sentence**

**{32}** Since it was decided over thirty years ago, *Garcia* has garnered criticism for failing to "answer the central question of proportionality as proposed by Justice White: whether there is a real difference between the many cases in which the death penalty is not imposed and the few cases in which it is."[4] In 2004, the Final Report of the New Mexico State Bar Task Force on the Administration of the Death Penalty in New Mexico outlined numerous problems in the application of *Garcia*, summarized as follows:

(1) Section 31-20A-4(C)(4) mandates that this Court conduct a comparative proportionality review in every case, but "*Garcia* says that review will be conducted only on request. [Section 31-20A-4(C)(4)] imposes responsibilities on the Supreme Court [while] *Garcia* imposes the responsibility on the defense to raise the issue and to supply comparison cases." Final Report, 18;

---

[4]State Bar of New Mexico, Task Force to Study the Administration of the Death Penalty in New Mexico, Final Report, 18 (Jan. 23, 2004) (hereinafter "Final Report"), https://www.nmbar.org/NMBARDOCS/PubRes/Reports/TaskforceDeathPenalty.pdf (last visited June 4, 2019) (referring to *Furman*, 408 U.S. at 313 (White, J., concurring)).

(2)	*Garcia* "set[s] an overly restricted definition of the universe of cases" because "using the jury's finding of an aggravating circumstance as the characteristic that defines what is a 'similar' case . . . [yields] only a handful of 'similar' cases to be considered." Final Report, 18-19;

(3)	While "th[is] Court has consistently rejected defense challenges to the *Garcia* standard, it has not applied the standard consistently over time." Final Report, 19;

(4)	"[This] Court has held sentences to be proportionate even when there are no other cases in which the defendant was sentenced to death," indicating that "the Court is using a reasonableness approach or . . . has created an unspoken presumption that a death sentence is always proportionate." Final Report, 19;

(5)	"[M]any cases simply state a conclusion—that the death penalty is not excessive or disproportionate—without explaining the process that led the Court to its conclusion. This makes it difficult for lawyers or the public to understand the basis for the conclusion." Final Report, 21;

(6)	"[T]here are still unresolved issues about how the *Garcia* standard applies to particular cases," including whether this Court will consider cases with the same aggravating circumstance or, in the absence of a similar case, "point[] to [factual] circumstances . . . [which] distinguish [the case under review] from the case in which a life sentence was imposed." Final Report, 21.

**{33}**	The problems identified in the Final Report were evident in Petitioners' direct appeals. In *Allen*, 2000-NMSC-002, ¶¶ 111-12, we did not expressly compare the case with similar cases but rather observed that the comparison cases were sufficiently outlined in *Clark*, 1999-NMSC-035, ¶¶ 78-83.[5] These included two cases in which a death sentence was imposed and two cases resulting in a life sentence. *Clark* disregarded a third case where the death sentence was imposed as unreliable "because the sentence was later overturned." *Id.* ¶ 79 (discussing *State v. Cheadle*, 1983-NMSC-093, 101 N.M. 282, 681 P.2d 708, *overruled on other grounds by State v. Belanger*, 2009-NMSC-025, ¶ 36, 146 N.M. 282, 681 P.3d 783). In *Fry*, our comparative proportionality review addressed six cases, four in which a death sentence was

---

[5]*Allen*, 2000-NMSC-002, ¶ 111 (citing *Clark*, 1999-NMSC-035, ¶¶ 78-80); *see also Clark*, 1999-NMSC-035, ¶¶ 78-80 (conducting a comparative proportionality review for the death sentence based on aggravating circumstances of kidnapping and murder of a witness and relying on *State v. McGuire*, 1990-NMSC-067, ¶¶ 1, 33, 110 N.M. 304, 795 P.2d 996 (affirming a life sentence where the State sought the death penalty and the jury found two aggravating circumstances, kidnapping and murder of a witness); *State v. Guzman*, 1984-NMSC-016, ¶¶ 16-18, 50, 100 N.M. 756, 676 P.2d 1321 (affirming the death sentence based on aggravating circumstances of kidnapping, criminal sexual penetration, and murder of a witness); *State v. Gilbert*, 1983-NMSC-083, ¶¶ 1, 61, 100 N.M. 392, 671 P.2d 640 (affirming the death sentence based on aggravating circumstances of criminal sexual penetration as to the first victim and criminal sexual penetration and murder of a witness as to the second victim); *State v. Hutchinson*, 1983-NMSC-029, ¶¶ 1, 5 n.1, 99 N.M. 616, 661 P.2d 1315 (affirming a life sentence where the defendant was charged with murder of a witness and kidnapping)).

imposed, two in which a life sentence was imposed. 2006-NMSC-001, ¶ 43.[6] All of these six cases involved the aggravating circumstance of kidnapping, as in Fry, as well as an additional aggravating circumstance. *See id.* We did not explain the effect of the additional aggravating circumstance or the fact that two of the four death sentences were commuted. *See id.* ¶¶ 43-44; Exec. Orders No. 86-37 (Gilbert), 86-39 (Guzman) (Nov. 26, 1986). We noted that Fry "killed the victim in a particularly brutal fashion" but did not expand the pool of comparison cases to review factually similar crimes. *Id.* ¶ 44. We find it significant that, as in *Fry* and *Allen*, this Court has never found a death sentence to be statutorily disproportionate when applying *Garcia*.

**{34}**   We agree with the Final Report that we are required under Section 31-20A-4(C)(4) to conduct a comparative proportionality review of every death sentence, contrary to *Garcia. See Garcia*, 1983-NMSC-008, ¶ 34. We further agree that our application of *Garcia* has been thus far insufficient to eliminate the possibility of an arbitrary and capricious sentence, contrary to *Furman*, 408 U.S. at 294-95, and *Gregg*, 428 U.S. at 206. However, practical barriers pose a significant challenge to conducting a meaningful proportionality review.

**{35}**   Although New Mexico has authorized the use of capital punishment since before statehood, the death penalty has been infrequently imposed.[7] Only one person has been executed since the enactment of the pre-repeal capital sentencing scheme in 1979. Wilson, *supra*, at 301. That person was Terry Clark, whose execution took place on November 6, 2001. *Id.* at 271. Before Clark, New Mexico had not executed anyone since David Cooper Nelson in 1960. *Id.* Only fifteen people, including Fry and Allen, have been sentenced to death since the enactment of the pre-repeal capital sentencing scheme in 1979. *Id.* at 266 & n.93. With the exception of Clark, none of these death sentences resulted in an execution.

**{36}**   Under the pre-repeal capital sentencing scheme, an offender convicted of first-degree murder could be subject to the death penalty only where the sentencing jury found one of seven aggravating circumstances. Section 31-20A-3; Section 31-20A-5(A)-(G). Most death-eligible cases did not reach the sentencing stage. Wilson, *supra*, at 271-72, 301. From July 1979 through December 2007, prosecutors sought the death penalty in only 211 cases. *Id.* at 266-67. Nearly half of these cases were resolved through plea bargains that removed death as a possible sentence. *Id.* at 268. The other half went to trial. *See id.* at 269. Thus, our limited universe of death penalty cases is in large part due to both plea bargaining and prosecutorial reluctance to seek the death penalty.

---

[6]*Fry*, 2006-NMSC-001, ¶¶ 43-44 (reviewing *Allen*, 2000-NMSC-002, ¶¶ 15, 118; *Clark*, 1999-NMSC-035, ¶¶ 79-80; *McGuire*, 1990-NMSC-067, ¶ 1; *Guzman*, 1984-NMSC-016, ¶¶ 16-18; *Gilbert*, 1983-NMSC-083, ¶¶ 1, 61; *Hutchinson*, 1983-NMSC-029, ¶ 5 n.1).

[7]Wilson, *supra*, at 301; *see, e.g., Territory v. Ketchum*, 1901-NMSC-006, ¶¶ 14-15, 10 N.M. 718, 65 P. 169 (affirming the death sentence for a defendant convicted of train robbery); *Territory v. Griego*, 1895-NMSC-020, ¶ 1, 8 N.M. 133, 42 P. 81 (recognizing that the penalty for first-degree murder was death).

**{37}** Fifty-two cases advanced to death penalty sentencing proceedings.[8] The others ended in acquittal or conviction on lesser charges for which the death penalty was no longer an available sentence. *Id.* at 269. Of the fifty-two cases, the jury found at least one aggravating factor and unanimously agreed on a death sentence just fifteen times.[9] Twelve of those fifteen death sentences were ultimately vacated: five reversed on direct appeal,[10] two reversed in habeas proceedings,[11] and another five commuted by Governor Toney Anaya in 1986.[12] Another was abated when the inmate died in prison.[13] Clark was the only one of the fifteen to be executed, and that execution proceeded only after Clark instructed counsel to abandon his appeals for postconviction relief. *Id.* at 271. Thus, even before the legislative repeal, capital punishment was a relative nullity in New Mexico. This rarity demonstrates a reluctance to impose the death penalty on the part of all three branches of government, which presents a significant challenge to the administration of a meaningful comparative proportionality review.

**{38}** Because relatively few death-eligible cases reach the death penalty sentencing phase in New Mexico, use of the same aggravating circumstance as the sole criteria for identifying similar cases has produced an impracticably small pool of comparison cases. *See* Final Report, 19-21. This is particularly true in *Fry*, which at the time of Fry's direct appeal was the only case involving kidnapping as the sole aggravator that was affirmed on appeal. *See Fry*, 2006-NMSC-001, ¶ 43; Wilson, *supra*, at 274 (explaining that kidnapping was usually alleged in combination with other aggravators). For this reason, we have resorted to using cases involving different aggravating circumstances in the comparative proportionality review, without explaining whether this is a departure from or modification of *Garcia*. Final Report, 19-20 (discussing the application of *Garcia* over time).

---

[8]In addition to the fifty-one cases advancing to death penalty sentencing before the completion of Marcia Wilson's study in 2007, Wilson, *supra*, at 269, a jury also considered the death penalty for Michael Astorga. *See State v. Astorga*, 2015-NMSC-007, ¶¶ 1-2, 343 P.3d 1245.

[9]*See* Wilson, *supra*, at 272. The following fourteen opinions and one waiver of direct appeal document these fifteen death sentences:  *State v. Treadway*, 2006-NMSC-008, 139 N.M. 167, 130 P.3d 746; *Fry*, 2006-NMSC-001; *Frank Martinez*, 2002-NMSC-008; *State v. Jacobs*, 2000-NMSC-026, 129 N.M. 448, 10 P.3d 127; *Allen*, 2000-NMSC-002; *State v. Jerome Martinez*, S-1-SC-22330, order (Aug. 26, 1996) (dismissing the direct appeal upon the death of the defendant); *State v. Henderson*, 1990-NMSC-030, 109 N.M. 655, 789 P.2d 603, *disapproved of on other grounds by Clark v. Tansy*, 1994-NMSC-098, ¶ 21; *State v. Clark*, 1989-NMSC-010, 108 N.M. 288, 772 P.2d 322, *disapproved of on other grounds by Henderson*,1990-NMSC-030, ¶ 14; *State v. Adams*, CR-86-0064 (10th Dist. Quay County Dec. 5, 1986) (waiving the right to directly appeal the judgment and sentence of death, anticipating commutation); *State v. Compton*, 1986-NMSC-010, 104 N.M. 683, 726 P.2d 837, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110;  *State v. Finnell*, 1984-NMSC-064, 101 N.M. 732, 688 P.2d 769; *Guzman*, 1984-NMSC-016; *Gilbert*, 1983-NMSC-083; *Garcia*, 1983-NMSC-008;*Cheadle*, 1983-NMSC-093.

[10]*Treadway*, 2006-NMSC-008; *Frank Martinez*, 2002-NMSC-008; *Jacobs*, 2000-NMSC-026; *Henderson*,1990-NMSC-030; *Finnell*, 1984-NMSC-064.

[11]*Clark v. Tansy*, 1994-NMSC-098, ¶ 29; *State v.Cheadle*, 1987-NMSC-100, ¶ 1, 106 N.M. 391, 744 P.2d 166; *but see Clark*, 1999-NMSC-035, ¶ 91 (affirming Clark's sentence of death upon resentencing).

[12]Exec. Orders No. 86-37 (Gilbert), 86-38 (Garcia), 86-39 (Guzman), 86-40 (Compton), 86-41 (Adams) (Nov. 26, 1986) (commuting the five death sentences); *see generally* Toney Anaya, *Statement by Toney Anaya on Capital Punishment*, 27 U. Rich. L. Rev. 177 (1993).

[13]*Jerome Martinez*, S-1-SC-22330, order at 1-2.

**{39}** Additionally, there is no central repository of information regarding death penalty cases, making it difficult to obtain the details and records necessary to thoroughly conduct the comparative proportionality review. As Fry and Allen note, "[t]he [L]egislature obligated [this] Court to conduct a proportionality analysis, but failed to provide any mechanism to collect the cases that could be used in the analysis." Unlike other states, New Mexico does not collect data to support comparative proportionality review. *See, e.g.*, Tenn. Sup. Ct. Rule 12 (1) (requiring the trial court to prepare a postconviction report for "all cases . . . in which the defendant is convicted of first-degree murder" with data to be used in the proportionality analysis). The underlying records in most death penalty cases in New Mexico are not electronically available, with the exception of those cases that were prosecuted shortly before the repeal. This invariably affected both the ability of defense counsel to bring meritorious challenges to the comparative proportionality of their clients' death sentences and the depth of this Court's review.

## C. We Modify Our Application of *Garcia* in Order to Fulfill the Legislature's Intent in Adopting Section 31-20A-4(C)(4)

**{40}** Fry and Allen urge us to overrule *Garcia*, asserting that *Garcia* has deprived them of a meaningful comparative proportionality review and that the mechanism for conducting this review should be modified in various ways. We decline to overrule *Garcia*. However, we modify *Garcia* in order to better fulfill the purposes of Section 31-20A-4(C)(4).

**{41}** We first recognize that the Washington Supreme Court, faced with similar concerns regarding proportionality review, recently declared Washington's death penalty scheme unconstitutional as administered in *State v. Gregory*, 427 P.3d 621, 629, 642 (Wash. 2018). Presented with a study demonstrating that in Washington "black defendants were four and a half times more likely to be sentenced to death than similarly situated white defendants," the court concluded "that Washington's death penalty is administered in an arbitrary and racially biased manner" and therefore violates the state constitution. *Id.* at 630, 633, 635-36; *see* Wash. Const. art. I, § 14 (prohibiting the infliction of "cruel punishment"). The court additionally concluded that, due to this arbitrary and racially biased administration, the death penalty scheme in Washington "fails to serve any legitimate penological goals." *Gregory*, 427 P.3d at 636, 642. Although the Washington Supreme Court has a statutory duty to review the comparative proportionality of a death sentence very similar to our own,[14] the court concluded that this mandatory review could not address the constitutional infirmities the court had identified. *Id.* at 637. While we share the Washington Supreme Court's concern that a death penalty scheme must provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many

---

[14]*Compare* Wash. Rev. Code § 10.95.130(2)(b) (requiring the Washington Supreme Court to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant"), *with* Section 31-20A-4(C)(4) (requiring this Court to consider whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant").

cases in which it is not," *id.* at 636 (alteration in original) (quoting *Furman*, 408 U.S. at 313 (White, J., concurring)), in order to address this concern we need not determine whether our 1979 capital sentencing scheme is unconstitutional as administered because we instead modify our approach to comparative proportionality review. *See Pangaea Cinema*, 2013-NMSC-044, ¶ 23 (prescribing avoidance of a conclusion of, or an allusion to, unconstitutionality in the construction of statutes).

**{42}**    While the United States Supreme Court has left states free to define the framework of their comparative proportionality reviews, *see Pulley*, 465 U.S. at 45, there are three steps implicit in any approach.[15] In the first step, the reviewing court defines a universe of cases from which similar cases are to be drawn. Final Report, 15-16. The broadest universe would include all death-eligible cases, whether or not the prosecutor elected to pursue the death penalty. *Id.* This allows a reviewing court to determine if a death sentence is disproportionate compared to cases prosecuted in districts with different characteristics and sentencing practices. A narrower universe might include only those cases in which the prosecutor sought the death penalty; all cases that progressed to a capital sentencing hearing; all cases in which the jury unanimously agreed on at least one aggravating factor and imposed either a life or death sentence; or—the narrowest possible option—cases in which the death penalty was imposed. *Id.*

**{43}**    The *Garcia* Court defined the universe of cases as including cases in which the death penalty was sought and which resulted in a sentence of death or life imprisonment that was affirmed on appeal. *Compare Garcia*, 1983-NMSC-008, ¶ 34 (stating that "[o]nly those New Mexico cases in which a defendant . . . received *either* the death penalty *or* life imprisonment and whose conviction and sentence have been upheld . . . will be considered appropriate for comparison"), *with State v. Bland*, 958 S.W.2d 651, 666-67 (Tenn. 1997) (defining "the universe from which we choose the pool of 'similar cases' for comparison [as] 'all cases in which the defendant was convicted of first-degree murder' ").

**{44}**    In the second step, the reviewing court must define what constitutes a "similar case." *See* Final Report, 15. This produces a pool of cases to be used for comparison purposes. *Id.* Some states use the approach embraced in *Garcia*, under which the pool is limited to cases involving the same aggravating circumstance as the death sentence under review. 1983-NMSC-008, ¶ 34. Many states include factually similar cases in the pool of comparison cases. *See, e.g.*, *Bland*, 958 S.W.2d at 667 (stating that "we are not limited to . . . cases in which exactly the same aggravating circumstances have been found" and considering for additional comparison a non-exhaustive list of salient facts including the manner of death and any justifications for the killing). Under *Garcia*, we select cases for comparison based on statutorily defined aggravating circumstances and have on occasion considered factual similarities in deciding to affirm a death

---

[15]*See* Final Report, 15-16. Courts often use the phrases "universe of cases" and "pool of cases" interchangeably. For clarity, this opinion uses the term "universe" to refer to the broad group of cases from which comparison cases are drawn, and "pool" to refer to the cases selected for comparison.

sentence. *See, e.g.*, *Allen*, 2000-NMSC-002, ¶ 111 (noting that, as in *Clark*, "[the] victim was a child"); *see also Clark*, 1999-NMSC-035, ¶ 82 (noting that the victim was a child).

**{45}**    The third and final step in conducting a comparative proportionality review is to define the test used to establish that a sentence is disproportionate. *See* Final Report, 15. Three approaches courts have taken in defining disproportionality are: (1) the statistical frequency approach, (2) the precedent-seeking approach, and (3) the reasonableness approach. *Id.* 16. The statistical frequency approach is "a measurement of the relative frequency of death sentences in factually similar cases." *Papasavvas*, 790 A.2d at 805. Before the repeal of the death penalty in 2007,[16] the New Jersey Supreme Court applied both statistical frequency and precedent-seeking approaches to assure that the death penalty had been imposed in similar cases. *Id.* at 804-05. For its statistical frequency analysis, New Jersey utilized the assistance of a special master and their administrative office of the courts. *State v. DiFrisco*, 662 A.2d 442, 450 (N.J. 1995). Allen urges that, like New Jersey, we should incorporate a frequency analysis into our comparative proportionality review in addition to a precedent-seeking approach. However, both Fry and Allen implicitly recognize that we lack the records and resources necessary to undertake a statistical review.

**{46}**    *Garcia* is a "precedent-seeking approach," which involves comparing the case to the pool of comparison cases in much the same way that a court typically reviews a case. *Clark*, 1999-NMSC-035, ¶ 74; Final Report, 17. The ultimate test is that "a defendant . . . should not be put to death if another defendant or other defendants, convicted of murder under the same aggravat[ing] circumstance is given life imprisonment, unless there is some justification." *Garcia*, 1983-NMSC-008, ¶ 34. This is similar to the Tennessee approach, in which a death sentence is disproportionate only "[i]f the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed," and "[a] death sentence is not disproportionate where the Court can discern some basis for the lesser sentence" received in another case with similar circumstances. *Bland*, 958 S.W.2d at 665.

**{47}**    "The reasonableness approach turns on generalized notions of reasonableness, which are in turn based on the particular court's values, experience and general familiarity with prior cases." Final Report, 17. Our application of *Garcia* has garnered criticism because we "ha[ve] held sentences to be proportionate even when there are no other cases in which the defendant was sentenced to death," indicating that we have resorted to "a reasonableness approach or . . . ha[ve] created an unspoken presumption that a death sentence is always proportionate." Final Report, 19. We will continue to adhere to a precedent-seeking approach but adopt the following modifications to *Garcia*.

1.    **We decline to expand the universe of cases beyond cases in which the death penalty was sought, the jury found at least one aggravating**

---

[16]2007 N.J. Sess. Law Serv. ch. 204 (West)

**circumstance, and which resulted in a sentence of death or life imprisonment that was affirmed on appeal**

**{48}** Fry and Allen urge this Court to expand the universe of cases from which similar cases have been drawn to include cases that could have been prosecuted as a death penalty case, regardless of whether the death penalty was actually pursued. Fry and Allen claim that death sentences are overrepresented under *Garcia* because the universe of cases excludes those in which the prosecutor did not seek the death penalty or offered a plea bargain in favor of life. Expanding the universe would enable us to examine the impact of prosecutorial discretion on the selection of which defendants were selected to receive the death penalty in New Mexico.

**{49}** The State argues that *Garcia* properly limits the universe of cases to those in which the prosecution sought and the jury had the option to impose a death sentence. *See Garcia*, 1983-NMSC-008, ¶ 34 ("In our review, we will consider only New Mexico cases in which a defendant has been convicted of capital murder under the *same aggravating circumstance(s).*"). We agree with the State on this point. The exercise of prosecutorial discretion is not enough to render death sentences constitutionally arbitrary. *See Gregg*, 428 U.S. at 199. We have determined that the *Furman* Court's concerns about "discretionary sentencing" did not extend to "the areas of charging, plea bargaining, jury verdicts and pardons merely because a possibility of selectivity exists." *State ex rel. Serna v. Hodges*, 1976-NMSC-033, ¶¶ 29-36, 89 N.M. 351, 552 P.2d 787, *overruled on other grounds by Rondeau*, 1976-NMSC-044, ¶ 9.

**{50}** Whether the New Mexico Legislature intended for comparative proportionality review under Section 31-20A-4(C)(4) to include reviewing the exercise of prosecutorial discretion presents a question of statutory interpretation. "We begin by looking at the language of the statute itself," while recognizing that the plain language "must yield on occasion to an intention otherwise discerned in terms of equity, legislative history, or other sources." *State v. Smith*, 2004-NMSC-032, ¶ 9, 136 N.M. 372, 98 P.3d 1022 (internal quotation marks and citation omitted).

**{51}** Section 31-20A-4(C)(4) does not expressly define the universe of cases, much less address whether we should limit our review to those cases in which the prosecutor sought the death penalty. The Legislature did not provide specific guidance as to which cases should be considered substantively or procedurally similar for purposes of comparative proportionality review. However, the term "similar cases" appears within the phrase "the penalty imposed in similar cases" in Section 31-20A-4(C)(4). Other courts have construed identical language as communicating an intent for the court to consider cases in which the prosecutor sought the death penalty and which progressed to a death penalty sentencing hearing, whether it resulted in a sentence of death or life imprisonment. *See, e.g.*, *Addison*, 7 A.3d at 1247.

**{52}** This interpretation is consistent with the history of Section 31-20A-4(C)(4). Our Legislature adopted Section 31-20A-4(C)(4) in response to *Furman* and *Gregg* which, in turn, provide insight into the appropriate parameters of the comparative proportionality

review. *See Addison*, 7 A.3d at 1230, 1239-40. Like other courts, we conclude that our comparative proportionality review requirement was designed to incorporate the constitutional standards which existed at the time of its adoption. *Id.*

{53}    We gather from *Furman* that Petitioners' death sentences are not per se disproportionate based on how rarely New Mexico prosecutors have pursued the death penalty. Although the *Furman* Court did not discuss comparative proportionality review, it observed that the rare imposition of the death penalty was not enough to prove that it was being imposed arbitrarily. *Furman*, 408 U.S. at 293 (Brennan, J., concurring) ("[T]housands of murders . . . are committed annually in States where death is an authorized punishment for those crimes," and "death is inflicted in only a minute fraction of these cases."). On the contrary, the rarity of the death penalty could indicate that it was being imposed carefully and selectively. *Id.* at 294 ("Informed selectivity . . . is a value not to be denigrated."). Based on this reasoning, we agree with the State that it would be "illogical to conclude that the Legislature included proportionality review in the [1979 capital sentencing scheme] as a poisoned pill designed to lead to *de facto* repeal of the death penalty by virtue of the fact that, as it should be, the death penalty is infrequently imposed."

{54}    *Gregg* confirms that the *Furman* Court was not concerned with prosecutorial discretion. *Gregg*, 428 U.S. at 199. In *Gregg*, the petitioner argued that Georgia's revised capital sentencing scheme remained unconstitutional because it continued to allow unfettered discretion in "the opportunities for discretionary action that are inherent in the processing of any murder case." *Id.* at 198-99. In addition to the prosecutorial discretion to decline pursuit of the death penalty and offer plea bargains in favor of life, these opportunities include the jury's discretion to exercise mercy and the governor's authority to commute a death sentence. *Id.* at 199. The *Gregg* Court addressed each of these and determined that a capital sentencing scheme was not constitutionally infirm simply because it gave these actors the legitimate discretion to spare a defendant from the death penalty. *Id.* This signals that the comparative proportionality review endorsed in *Gregg* was not intended to include review of the exercise of prosecutorial discretion.

{55}    This is consistent with the approach used by the majority of states. Most states limit their comparative proportionality reviews to cases in which the prosecutor sought the death penalty. *See, e.g.*, *State v. Ross*, 624 A.2d 886, 886 (Conn. 1993) (per curiam) (considering "cases in which the conviction of a capital felony after trial was followed by a hearing to consider the imposition of the death penalty"); *Flamer v. State*, 490 A.2d 104, 138-39 (Del. 1983) ("[W]e think it inherently fair, logical and necessary to prevent disproportionate sentencing that this Court compare the sentence below to the facts and circumstances of cases in which a capital sentencing proceeding was actually conducted, whether the murders have been sentenced to life imprisonment or death."); *State v. Whitfield*, 837 S.W.2d 503, 515 (Mo. 1992) (en banc) ("[T]his Court does not compare death-penalty cases to cases where the death penalty was not sought—such as where the death penalty was waived or the offense of conviction was less than first degree murder."); *State v. Kills on Top*, 793 P.2d 1273, 1308 (Mont. 1990) (comparing to cases involving the aggravating circumstance of kidnapping); *Petrocelli v. State*, 692

P.2d 503, 511 (Nev. 1985) (considering cases where the jury found some of the same aggravating circumstances), *superseded by statute on other grounds as stated in Thomas v. State*, 83 P.3d 818, 823 (Nev. 2004); *State v. McHone*, 435 S.E.2d 296, 307 (N.C. 1993) (including "all cases arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment" (internal quotation marks and citation omitted)); *Lewis v. Commonwealth*, 593 S.E.2d 220, 226 (Va. 2004) ("In conducting this review, this Court considers the records of all capital murder cases reviewed by this Court, including cases in which the defendant received a life sentence.").

**{56}** By contrast, few states have opted to include in the comparative proportionality review cases in which the prosecutor did not seek the death penalty. *See, e.g., Papasavvas*, 790 A.2d at 804 ("We will . . . consider all death-eligible cases, whether or not they were capitally prosecuted, because the State's decision not to prosecute the defendant capitally does not necessarily reflect on [the] defendant's lack of deathworthiness." (alteration and omission in original) (citation omitted)); *Commonwealth v. DeHart*, 516 A.2d 656, 671 (Pa. 1986) (including "all cases of murder of the first degree convictions which were prosecuted or could have been prosecuted under the death penalty statute"); *Bland*, 958 S.W.2d at 666 (defining "the universe from which we choose the pool of 'similar cases' for comparison [as] 'all cases in which the defendant was convicted of first-degree murder' " (citation omitted)).

**{57}** Because the *Gregg* Court was not concerned with prosecutorial discretion, we also conclude that the New Mexico Legislature, by modeling its review on the comparative proportionality review endorsed in *Gregg*, did not intend for Section 31-20A-4(C)(4) to serve as a check on the exercise of prosecutorial discretion. Under *Gregg*, prosecutors are free to exercise their discretion in favor of life. *See* 428 U.S. at 199. We decline to adopt a construction of Section 31-20A-4(C)(4) that would encourage prosecutors to seek the death penalty in order to maintain a robust universe of cases. We therefore reject Petitioners' argument that we should expand the universe of cases to all cases in which the death penalty could have been pursued.

**{58}** We also consider whether the comparative proportionality review should be modified to account for the exercise of executive clemency. This power was given to the governor by the people. N.M. Const. art. V, § 6. Like prosecutorial discretion, the governor's power to commute sentences is "outside of the effective control of legislatures" and an "inevitable component[] of any capital scheme." Sherod Thaxton, *Disciplining Death: Assessing and Ameliorating Arbitrariness in Capital Charging*, 49 Ariz. St. L.J. 137, 195 (2017). Because comparative proportionality review was intended to review "caprice in the decision to inflict the death penalty," a governor's isolated decision to afford mercy does not render an otherwise valid death sentence unconstitutional. *See Gregg*, 428 U.S. at 199, 203.

**{59}** Governor Anaya commuted the majority of death sentences imposed under the pre-repeal, 1979 capital sentencing scheme. *See* Exec. Orders Nos. 86-37, 86-38, 86-

39, 86-40, 86-41 (Nov. 26, 1986). Under *Gregg*, this does not render Petitioners' death sentences disproportionate. *See* 428 U.S. at 199. Because the constitutional jurisprudence gives us no reason to review this exercise of power, we will continue to consider these cases as death penalty cases for purposes of the comparative proportionality review.

**{60}** We also limit our review to cases prosecuted under the pre-repeal, 1979 capital sentencing scheme. "To include cases decided before enactment of the present [s]tatute would require consideration of cases decided under the various constitutionally infirm statutes which predate the current one," *Flamer*, 490 A.2d at 139, and to include cases prosecuted under the post-repeal scheme would ensure a de facto repeal of the death penalty. This would contradict the Legislature's intent in enacting a savings clause for murders committed before July 1, 2009.

**{61}** The *Garcia* Court's definition of the universe of cases includes one more restriction: we consider only those cases which were affirmed on appeal. 1983-NMSC-008, ¶ 34. This is a reasonable restriction because cases in which the defendant did not appeal cannot be considered a reliable indicator of facts warranting a given sentence. Moreover, because defendants facing either death or life imprisonment almost uniformly appealed, this restriction does not result in the exclusion of a great number of viable comparison cases. *But see, e.g.*, *Adams*, CR-86-0064 (10th Dist. Quay County Dec. 5, 1986) (waiving the right to directly appeal the judgment and sentence of death, anticipating commutation).

**{62}** In sum, we hold that the universe of cases is properly limited under *Garcia* to those cases in which the prosecutor decided to seek the death penalty, which advanced to a death penalty sentencing hearing in which the jury found at least one aggravating circumstance, and which resulted in a sentence of death or life imprisonment which was affirmed on appeal. 1983-NMSC-008, ¶ 34.

**2.     We expand the pool of cases to include both cases involving the same aggravating circumstance and factually similar cases in which the jury had the option to impose the death penalty**

**{63}** The second step of the comparative proportionality review requires us to identify the particular characteristics to be used to identify a " 'similar case.' " Final Report, 15. While we adhere to *Garcia's* definition of the universe of cases, we reconsider the pool of comparison cases and determine that the pool must be expanded from cases involving first-degree murder convictions with the same aggravating circumstances to include factually similar crimes in which the jury considered the death penalty. In reaching this conclusion, we are guided by the *Gregg* Court's understanding that "[*i*]*f a time comes when juries generally do not impose the death sentence in a certain kind of murder case*, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death." 428 U.S. at 206 (emphasis added).

**{64}** The *Garcia* Court included within the pool of comparison cases only those cases involving the same aggravating circumstances. 1983-NMSC-008, ¶ 34. In cases with the same aggravating circumstance, prosecutors decided to pursue the death penalty and juries found the defendants to be guilty of substantively similar conduct. As such, the *Garcia* approach ensures that the pool is restricted to cases which are substantively and procedurally similar for purposes of comparative proportionality review. *Cf. Addison*, 7 A.3d at 1249-1251 (stating that "the substantive characteristics of 'similar cases' also include [statutory] aggravating and mitigating factors"). In theory, this enables us to determine if the death penalty is generally imposed for "a certain kind of murder case," as intended under *Gregg*, 428 U.S. at 206.

**{65}** However, given the rarity of death penalty prosecutions in New Mexico, the *Garcia* Court's definition of the pool of comparison cases has proven to be unworkable. Final Report, 19 (describing the *Garcia* approach as "logical" but noting that it yields "only a handful of 'similar' cases" for the comparative proportionality review). Only four cases have aggravating circumstances identical to *Allen*,[17] and the only case with aggravating circumstances identical to *Fry* is Fry's own conviction for an unrelated murder.[18] Such a small pool of cases distorts our view of the application of the death penalty for similar crimes.

**{66}** We acknowledge, as Petitioners contend, that our comparative proportionality review must be applied to "fully answer the central question of . . . whether there is a real difference between the many cases in which the death penalty is not imposed and the few cases in which it is." Final Report, 18; *see Furman*, 408 U.S. at 313-14 (White, J., concurring). Further, the *Gregg* Court intended for the comparative proportionality review to

> substantially eliminate[] the possibility that a person will be sentenced to die by the action of an aberrant jury. If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death.

428 U.S. at 206. We are unable to provide that assurance when the pool of comparison cases is restricted to only those with the same aggravating circumstances.

---

[17]*McGuire*, 1990-NMSC-067, ¶ 1 (noting the jury findings of kidnapping and murder of a witness as aggravating circumstances); *Clark*, 1989-NMSC-010, ¶ 54 (stating that the jury found the aggravating circumstances of kidnapping and murder of a witness); *State v. Zinn*, 1987-NMSC-115, ¶ 1, 106 N.M. 544, 746 P.2d 650 (affirming convictions including first-degree murder and the life sentence without specifying findings of aggravating factors); *State v. Zinn*, D-202-CR-1986-41129, miscellaneous entries forms of finding (Sept. 30, 1986) (finding the aggravating circumstances of murder of a likely witness and murder in the commission of kidnapping); *Hutchinson*, 1983-NMSC-029, ¶ 5 n.1 (finding the aggravating circumstances of murder of a likely witness and murder in the commission of a kidnapping).
[18]*State v. Fry*, S-1-SC-29025, dec. ¶¶ 4-5 (Aug. 28, 2007) (noting that the State sought the death penalty on the aggravating circumstance of kidnapping); *State v. Fry*, D-1116-CR-2000-00542, miscellaneous entry (Sep. 4, 2003) (finding the aggravating circumstance of murder in the commission of a kidnapping).

**{67}**  Other states include factually similar cases in the comparative proportionality review. *See, e.g.*, *Addison*, 7 A.3d at 1253 (reviewing the facts underlying the murder, the aggravating factors, and the mitigating factors because "[t]hese characteristics found by the jury establish the unique footprint of the case within which the jury considered . . . the crime and the character and background of the particular defendant to decide whether to impose the death penalty"); *Papasavvas*, 790 A.2d at 805 (describing the "salient-factors test," under which "every death-eligible case is assigned to one of thirteen categories based on the statutory aggravating factors," and further grouped by "circumstances that serve either to aggravate or to mitigate the blameworthiness of the defendants in those cases" (internal quotation marks and citation omitted)); *Bland*, 958 S.W.2d at 667 ("Though consideration of the aggravating and mitigating circumstances . . . is a crucial element of the process, we are not limited to only those cases in which exactly the same aggravating circumstances have been found.").

**{68}**  In Tennessee, for example, the Supreme Court considers a non-exhaustive list including "the manner of death (e.g., violent, torturous, etc.)," "the victim's circumstances including age [and] physical and mental conditions," "the absence or presence of provocation . . . [or] justification," and "the injury to and effects on nondecedent victims." *Bland*, 958 S.W.2d at 667. Although the Tennessee Supreme Court recognized that the factual similarities considered when choosing comparison cases "are not readily subject to complete enumeration and definition," the court reviewed the relevant facts it had considered in prior cases. *Id.* In New Mexico, a comprehensive list of factual similarities relevant to the identification of comparison cases is particularly elusive due to the limited nature of our review under *Garcia* in prior cases.

**{69}**  However, examining the universe of death penalty cases in New Mexico, we observe that juries had the option to impose the death penalty in a number of cases with factual similarities to *Fry* and *Allen* but which did not result in the same aggravating circumstances. Specifically, regardless of the aggravating circumstances alleged, many cases involved the murder of youthful, typically female victims in the commission of a sexual assault.[19] These cases were excluded from consideration on direct appeal because, although Fry and Allen were both convicted of attempted criminal sexual penetration and therefore guilty of similar conduct, neither was charged with or found guilty of murder in the commission of a criminal sexual penetration as a statutory aggravating circumstance.

---

[19]*See, e.g.*, *State v. Lovett*, 2012-NMSC-036, ¶¶ 1-3, 286 P.3d 265; *State v. Stills*, 1998-NMSC-009, ¶ 1, 125 N.M. 66, 957 P.2d 51; *State v. Harris*, S-1-SC-23306, dec. at ¶ 1, 3 (June 11, 1998) (non-precedential); *McGuire*, 1990-NMSC-067, ¶¶ 1, 4-5; *Henderson*, 1990-NMSC-030, ¶¶ 2-4; *Clark*, 1989-NMSC-010, ¶¶ 1, 3; *Zinn*, 1987-NMSC-115, ¶¶ 1-4; *Guzman*, 1984-NMSC-016, ¶¶ 16-18, 50; *Cheadle*, 1983-NMSC-093, ¶¶ 1, 46; *Gilbert*, 1983-NMSC-083, ¶¶ 1, 61; *Hutchinson*, 1983-NMSC-029, ¶¶ 1-3; *cf. State v. Ortega*, 1991-NMSC-084, ¶¶ 1-2, 112 N.M. 554, 817 P.2d 1196 (affirming two life sentences for conviction of two first-degree felony murders of two young females, one fourteen years old), *overruled on other grounds by State v. Fraiser*, 2007-NMSC-032, ¶¶ 1, 30-31, 142 N.M. 120, 164 P.3d 1.

**{70}**    Additionally, we note that while New Mexico prosecutors maintained no written criteria for when to pursue the death penalty, they considered additional factors relevant in determining whether to seek the death penalty, including the age of the victim, whether the crime was ethnically motivated, opinions of the victim's family, the number of victims, the suffering of the victim, the generally severe or aggravated nature of the crime, and the impact of the crime on the community. Final Report, 14-15. We consider these factors relevant when determining what makes a case factually similar.

**{71}**    In light of the limitations posed by the small universe of death penalty cases, we see no principled reason to exclude factually similar cases in which the jury considered the death penalty from the pool of comparison cases. These cases, like cases involving the same aggravating circumstance, are substantively and procedurally similar to the cases under review because the jury had the option to impose the death penalty based on similar facts. Expanding our review to consider these cases may reveal a pattern where no pattern was readily discernible among cases involving the same aggravating circumstances. This will better serve the purposes of comparative proportionality review by enabling us to determine whether Fry and Allen were sentenced to death by an aberrant jury, in accordance with *Gregg*, 428 U.S. at 206, and thereby ensure that the death penalty is reserved for the most heinous crimes. *See Furman*, 408 U.S. at 313-14 (White, J., concurring); *see also id.* at 293-95 (Brennan, J., concurring).

**{72}**    We therefore expand the pool of cases to include factually similar cases in which the jury considered the death penalty. We adhere to *Garcia* to the extent that the *Garcia* approach uses the same aggravating circumstance as the starting point for identifying the pool of comparison cases. However, we will also give meaningful consideration to factually similar crimes in which the jury considered the death penalty.

### 3.    A death sentence is disproportionate if juries do not generally impose a death sentence in similar cases and there is no justification for the death sentence to be imposed

**{73}**    In the third step of our comparative proportionality review, we turn to the test to be used to establish that a sentence is disproportionate. *Garcia* states that a death sentence should not be affirmed when similar cases ended in life imprisonment, "unless there is some justification." 1983-NMSC-008, ¶ 34. We have further recognized that "our function in performing comparative review is not to search for proof that a defendant's death sentence is perfectly symmetrical, but to identify and invalidate the aberrant death sentence." *Clark*, 1999-NMSC-035, ¶ 80 (quoting *Bland*, 958 S.W.2d at 665). In practice, however, our application of this test has resulted in "an unspoken presumption that a death sentence is always proportionate." Final Report, 19.

**{74}**    In our initial review of Petitioners' death sentences, we did not explain why Petitioners' death sentences should be affirmed when the majority of defendants received life sentences for similarly shocking crimes. Instead, we concluded that certain facts justified their death sentences without meaningfully considering factually similar cases and whether juries generally imposed death sentences in those cases. *See, e.g.,*

*Fry*, 2006-NMSC-001, ¶ 44 (describing the murder as "particularly brutal"); *Allen*, 2000-NMSC-002, ¶ 111 (noting that Allen's victim, like Clark's, "was a child"); Final Report, 21 ("[This] Court has affirmed [a] death sentence by pointing to circumstances that, in its view, distinguish [a death sentence case] from the case in which a life sentence was imposed. However, the distinguishing factors change from case to case."). For this reason, Fry and Allen argue that they were deprived of a meaningful proportionality review and that "[i]n practice, proportionality review in New Mexico has not served as a meaningful check on arbitrary and capricious death sentences."

**{75}** *Furman* and *Gregg* require more. Comparative proportionality review must provide "a meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *See Furman*, 408 U.S. at 313-14 (White, J., concurring). Specifically, the *Gregg* Court stated that the comparative proportionality requirement would assure that the death penalty would not be imposed unless the death penalty was "imposed generally" in similar cases. 428 U.S. at 205-06 (internal quotation marks and citation omitted). Although *Garcia* is not inherently inconsistent with the requirements of *Furman* and *Gregg*, in practice our comparative proportionality review has failed to meet the burden of assuring that the death penalty is not imposed in one case where it is not generally imposed in similar cases.

**{76}** At a minimum, comparative proportionality review requires that we thoroughly acknowledge and give meaningful consideration to similar cases that ended in a life sentence. *State v. Timmendequas*, 773 A.2d 18, 26 (N.J. 2001) (concluding that "[w]ithout knowledge of the life-sentenced cases, [a court] would be unable to determine whether there is a meaningful basis for distinguishing the death sentences it reviews from the many cases in which lesser sentences are imposed" (alterations in original) (internal quotation marks and citation omitted)); *see* Final Report, 18-19 (illustrating the distortion created by a limited universe). "[A] significant number of similar cases in which death was not imposed might well provide the most relevant evidence of arbitrariness in the death sentence before the Court." *Walker v. Georgia*, 555 U.S. 979, 981 (2008) (Stevens, J., concurring) (respecting the Court's denial on procedural grounds of a petition for writ of certiorari asking whether the Georgia death penalty scheme violated the Eighth Amendment arbitrariness prohibition).

**{77}** In practice, we have not addressed the question of whether a defendant's death sentence is an aberration and have instead conducted a traditional proportionality review. In focusing primarily on facts that *could have* justified the imposition of the death sentence without meaningfully considering other cases involving similar facts, we have not answered the central question of whether the defendant's death sentence is an aberration from the norm. *See, e.g.*, *Garcia*, 1983-NMSC-008, ¶ 40 ("In our duty to review the determination by the jury, we will not retry the case for what may be a better result." (emphasis omitted)). Comparative proportionality is not a question for the jury but rather is intended to serve as a check on the exercise of jury discretion in sentencing. *See Wyrostek*, 1994-NMSC-042, ¶ 15. "[T]he primary focus [in assessing the comparative proportionality of a death sentence] is not on the reasonableness of the jury's sentence of death, but rather on how that sentence compares to jury dispositions

in comparable cases." *Papasavvas*, 790 A.2d at 827 (Stein, J., concurring); *see also* Final Report, 17 ("[T]he jury is not asked, and, in our view, should not be asked, to determine whether a death sentence for this particular defendant is warranted given the sentences meted out for similar crimes. This is an entirely different question that is entrusted to the highest court of states that perform this type of review."). This review "differs qualitatively from the usual type of appellate review." Wilson, *supra*, at 265-66. We do not question the proportionality of the death sentences in the traditional sense but instead consider whether there is truly a meaningful basis for distinguishing Fry and Allen from similar cases resulting in a life sentence.

**{78}**   Other courts have clarified that

> the appellate task under [comparative] proportionality review was not to determine whether the capital case before it in some way was, on a scale of moral blameworthiness, roughly equivalent to all other capital cases and, absent such rough equivalence, to reverse the sentence. Nor was that review considered to require that the capital case before the court must affirmatively be shown, on such a scale, to have been quantitatively different from all other cases in which the death penalty was not imposed and, absent such an affirmative showing, to reverse the sentence. In the Supreme Court's view, rather, the appellate inquiry under proportionality review was whether the death penalty imposed in a particular case was aberrational, within the particular jurisdiction involved, with respect to similar cases.

*State v. Webb*, 680 A.2d 147, 204 (Conn. 1996) (discussing *Gregg*). We must construe Section 31-20A-4(C)(4) in a manner that is consistent with that intent and must do more than determine "whether anyone else has ever been sentenced to death under similar circumstances." Final Report, 17.

**{79}**   Consistent with the constitutional principles of *Furman* and *Gregg*, we conclude that a death sentence is disproportionate if juries do not generally impose a death sentence in similar cases and there is no real justification for the death sentence.

### 4.   Principles of stare decisis do not prevent us from modifying *Garcia*

**{80}**   The State argues that stare decisis prevents us from overruling or modifying *Garcia* because the Legislature left *Garcia* undisturbed for nearly thirty years before the repeal. Because we "take care to overrule established precedent only when the circumstances require it," *State v. Pieri*, 2009-NMSC-019, ¶ 21,146 N.M. 155, 207 P.3d 1132, we modify *Garcia* only to the extent required to fulfill the purpose of Section 31-20A-4(C)(4).

**{81}**   This is not a case where the purpose of the statute must be inferred from silent acquiescence to a well-settled interpretation of law. *See, e.g.*, *Patterson v. McLean Credit Union*, 485 U.S. 617, 619-20 (1988) (per curiam) (Blackmun, J., dissenting)

(disagreeing with the majority's reconsideration of an issue of statutory interpretation because Congress expressly rejected legislation to override the existing statutory interpretation). To the contrary, the Legislature's intent in adopting Section 31-20A-4(C)(4) is clear from its history, and our application of *Garcia* has not fulfilled that purpose. This is sufficient justification to modify our approach to comparative proportionality review. *See State ex rel. Lee v. Hartman*, 1961-NMSC-171, ¶ 29, 69 N.M. 419, 367 P.2d 918 (stating that we resort to the interpretative canon of legislative acquiescence "when direct methods of interpretation have failed").

**{82}**    The State's argument would have greater force if we were overruling a functional approach to comparative proportionality review. *Garcia* proved to be unworkable in practice because it identified an overly restricted pool of cases. *See Pieri*, 2009-NMSC-019, ¶ 21; *see also* Final Report, 19-21. Legislative acquiescence "falls far short of providing a basis to support a [statutory] construction . . . so clearly at odds with [the statute's] plain meaning and legislative history." *Aaron v. Sec. and Exch. Comm'n*, 446 U.S. 680, 694 n.11 (1980); William N. Eskridge, Jr., *Interpreting Legislative Inaction*, 87 Mich. L. Rev. 67, 76 (1988) ("[S]ubsequent legislative inactivity cannot ratify a clearly erroneous prior interpretation."). For these reasons, we are unpersuaded by the State's theory of legislative acquiescence.

**D.    Imposition of Death Sentences Against Fry and Allen Is Disproportionate to the Penalties Imposed in Similar Cases**

**1.    Cases involving the same aggravating circumstances as *Fry* and *Allen* did not generally result in death sentences**

**{83}**    To determine whether Petitioners' death sentences are statutorily proportionate to the penalty imposed in similar cases, we begin with the framework set forth in *Garcia*, 1983-NMSC-008, ¶ 34. Under *Garcia*, *Fry* and *Allen* must be compared to other cases with the same aggravating circumstance. *Id.* "[A] defendant convicted of first degree murder under a specific aggravat[ing] circumstance should not be put to death if another defendant or other defendants[] convicted of murder under the same aggravat[ing] circumstance is given life imprisonment, unless there is some justification." *Id.*

**{84}**    Fry was sentenced to death based on the aggravating circumstance of kidnapping. *Fry*, 2006-NMSC-001, ¶ 6. On the night of the murder, he was carrying "an eight-inch Bowie knife" and told his accomplice that he wanted " 'to stick somebody tonight.' " *Id.* ¶ 2. Fry and his accomplice found the victim stranded at a Farmington convenience store, where she was crying at a payphone, and offered to drive her to her home in Shiprock. *Id.* ¶ 3. The victim left with Fry and his accomplice but tried to walk away when Fry stopped the car on a dirt road to relieve himself. *Id.* Fry convinced her to get back in the car and briefly drove on before he stopped and pulled the victim out of the car by her hair. *Id.* ¶¶ 3-4. He then attempted to disrobe the victim and, when she struggled, stabbed her in the chest. *Id.* ¶ 4. The victim pulled the knife out and tried to run away, but Fry caught her and hit her in the back of the head with a sledgehammer "at least three and possibly five times." *Id.* The victim died as a result of her injuries. *Id.*

**{85}**     Of cases advancing to a death penalty sentencing hearing, the only other case involving the sole aggravating circumstance of kidnapping which was affirmed on appeal also involved Robert Fry. *See State v. Fry*, S-1-SC-29025, dec. ¶¶ 1-5 (Aug. 28, 2007).[20] This subsequent case against Fry involved the same accomplice and was prosecuted at roughly the same time as the case for which he received the death penalty. *Id.* ¶ 4. In that subsequent case, Fry received a life sentence for the kidnapping and murder of a man. *Id.* ¶¶ 1, 7. Fry and his accomplice offered the man a ride. *Id.* ¶ 7. As Fry drove the victim outside Farmington, he elbowed the victim's face and Fry's accomplice "wrapped a leather belt around [the victim's] chest or neck." *Id.* ¶ 7. Fry got out of the truck and fought with the victim. *Id.* At Fry's direction, his accomplice got a shovel out of the truck and hit the victim with it. *Id.* Fry then "kicked and hit [the victim], beat him with a broomstick, then, after the stick broke, used it to stab [the victim] in his face, chest, and groin." *Id.* Fry and his accomplice then searched the still living victim for money before kicking him over a ledge, where the victim's body was later found. *Id.* ¶¶ 2, 7. Fry's accomplice testified against him at trial and Fry was convicted of first-degree murder, kidnapping, attempted robbery, and tampering with evidence. *Id.* ¶¶ 1, 3. At the sentencing phase, the jury found the kidnapping aggravator but did not unanimously agree to the death penalty. *Id.* ¶¶ 5, 13; *State v. Fry*, D-1116-CR-2000-00542, miscellaneous entry (Sep. 4, 2003).

**{86}**     Under a strict application of *Garcia*, the only case for comparison to *Fry* is a case involving the same defendant, the same accomplice, and very similar conduct, but which did not result in a death sentence. Similar cases involving two kidnapping aggravators also resulted in life sentences. In *State v. Bedford*, S-1-SC-30664, dec. ¶ 1, (June 23, 2010) (non-precedential) and *Ortega*, 1991-NMSC-084, ¶ 2, each defendant was convicted of two counts of first-degree murder and two counts of first-degree kidnapping. In the penalty phase in each case the jury found the aggravating factor of kidnapping for both murders.[21] While both the *Bedford* and *Ortega* juries were unanimous in finding the kidnapping aggravators, neither jury agreed unanimously on the death penalty. *Bedford*, D-911-CR-2005-00046, special verdict (June 28, 2007); *Ortega*, 1991-NMSC-084, ¶ 2.

**{87}**     Stanley Bedford received a life sentence for a murder in which the two victims were burned alive in the trunk of their car. *Bedford*, S-1-SC-30664, dec. ¶¶ 1-3. Bedford and the victims' nephew entered the victims' home. *Bedford*, S-1-SC-30664, dec. ¶ 2. There, Bedford attacked the victims, took their jewelry and credit cards, restrained them, forced the couple into the trunk of their car, drove them out of town, and beat the husband with a metal pipe. *Id.* ¶¶ 2-3. Bedford and the victims' nephew then filled gas cans and Bedford watched as the victims' nephew poured the gas on the car and set it on fire with both victims most likely alive in the trunk. *Id.* ¶¶ 2-3, 30. Bedford was convicted of two counts of first-degree murder, two counts of kidnapping, two counts of

---

[20]*Jacobs* is not a reliable comparison case because the death sentence was not affirmed on appeal. *See* 2000-NMSC-026, ¶¶ 1, 3 (reversing the sentence due to error in the penalty phase of the trial).

[21]*State v. Bedford*, D-911-CR-2005-00046, court's jury instructions (June 21, 2007) (finding kidnapping aggravators for both victims); *State v. Ortega*, D-202-CR-1988-44752, miscellaneous entries (Nov. 15, 1988) (finding kidnapping aggravators for both victims).

tampering with evidence, one count of aggravated burglary, and one count of disposal of stolen property. *Id.* ¶ 1. The jury found two kidnapping aggravators but did not agree unanimously on the death penalty. *Bedford*, D-911-CR-2005-00046, court's jury instructions (June 21, 2007) and special verdict (June 28, 2007).

**{88}** Similar to Bedford, the jury did not impose the death penalty on Richard Michael Ortega for a brutal double murder. *Ortega*, 1991-NMSC-084, ¶¶ 1-2. The victims met Ortega in an Albuquerque park and left the park with him under the impression that he could help them buy cocaine. *Id.* ¶¶ 5-6. The victims were fourteen and twenty-one years old. *Id.* ¶ 4. Ortega observed that the victims "looked rich" and told his accomplice that he wanted to rob them and steal their car. *Id.* ¶ 5. Ortega eventually led the victims to a vacant lot, where he violently stabbed them. *Id.* ¶¶ 6, 7, 10. Ortega inflicted twenty-eight stab wounds on one victim and forty-two on the other. *Id.*¶ 10. The jury found the aggravating circumstance of kidnapping with respect to both victims but did not unanimously agree on the death sentence. *Id.* ¶ 2; *Ortega*, D-202-CR-1988-44752, miscellaneous entries (Nov. 15, 1988). Ortega was sentenced to two consecutive terms of life imprisonment plus sentences for the other crimes for a total prison term of eighty-seven years. *Ortega*, 1991-NMSC-084, ¶ 2.

**{89}** Neither *Bedford* nor *Ortega* supports the conclusion that Fry's death sentence is statutorily proportionate. Fry had one victim; Bedford and Ortega each had two. The jury in *Fry* found one aggravator; the juries in *Bedford* and *Ortega* each found two. Yet Fry received a death sentence and Bedford and Ortega did not. Considering *Bedford*, *Ortega*, and Fry's later conviction, we conclude that the death penalty was not generally imposed in cases involving the same aggravating circumstances as *Fry*.

**{90}** Although the statutory proportionality requirement does not require perfect symmetry in sentencing, it does require some justification for a disparity between the death sentence under review and the life sentences in similar cases. *Garcia*, 1983-NMSC-008, ¶ 34. The only distinction between *Fry* and the other cases is that *Fry* involved a conviction of attempted criminal sexual penetration.[22] To determine whether that distinction is sufficient justification for the sentencing disparity, we will consider the expanded pool of factually similar crimes in the next section.

---

[22]We acknowledge that, according to his accomplice's testimony, Bedford did not set the car on fire himself. *Bedford*, S-1-SC-30664, dec. ¶¶ 2-3. This does not serve to justify the sentencing disparity between Bedford and Fry because in the majority of the cases similar to *Fry* which resulted in a life sentence the defendant committed the heinous acts himself. *See Lovett*, 2012-NMSC-036, ¶¶ 1, 7-8, 18 (affirming convictions of first-degree murder and criminal sexual penetration where the victim's blood was found on defendant's clothes and the defendant's DNA was found on the scene with the victim's body); *State v. Bryant*, S-1-SC-26112, dec. ¶¶ 1, 22, 27 (Dec. 4, 2001) (non-precedential) (discussing the defendant's life sentence for strangling the victim as he raped her and affirming defendant's convictions); *Harris*, S-1-SC23306, dec. ¶¶ 1-2, 3-5 (affirming a life sentence where the defendant sexually assaulted and murdered a woman)*; Stills*, 1998-NMSC-009, ¶¶ 1-2, 13 (affirming a life sentence where the defendant sexually assaulted and murdered his stepdaughter); *McGuire*, 1990-NMSC-067, ¶¶ 1, 4-5(affirming a life sentence where the defendant raped and then murdered the victim while the defendant's step-brother drove); *Hutchinson*, 1983-NMSC-029, ¶¶ 1, 3 (affirming a life sentence where the defendant kidnapped, raped, and murdered the victim with the help of two others).

**{91}** Before we consider the expanded pool of factually similar cases, we turn to *Allen*, who was sentenced to death for murdering a seventeen-year-old girl. *Allen*, 2000-NMSC-002, ¶¶ 1-2. The victim lived with her mother and was last seen walking toward a convenience store about a mile from her home. *Id.* ¶ 2. The victim had gone into town to apply for a job and pay her mother's water bill, and planned to return by evening. *Id.* She did not come home. *Id.* Six weeks later, her body was discovered in a remote area outside of town. *Id.* ¶ 3. The victim's pants and underwear had been removed and her shirt pushed up over her bra. *Id.* ¶ 4. Investigators testified that the condition of her clothing was consistent with sexual assault and that the cause of her death was ligature strangulation. *Id.* ¶¶ 5-6. In addition, there was bruising on her legs. *Id.* ¶ 5. Allen was sentenced to death plus imprisonment for his noncapital convictions of kidnapping and attempted criminal sexual penetration. *Id.* ¶ 15.

**{92}** For *Allen*, the comparison cases are clearly identifiable under *Garcia*. The aggravating circumstances were kidnapping and murder of a witness. *Allen*, 2000-NMSC-002, ¶ 15. Four other cases involved identical aggravators: *Clark*, *Zinn*, *Hutchinson*, and *McGuire*. The death sentence was imposed in only one of these cases.

**{93}** In more than a half century, *Clark* is the only case in which the State of New Mexico carried out an execution. Wilson, *supra*, at 271. Terry Clark was sentenced to death for kidnapping, raping, and murdering a nine-year-old girl. *Clark*, 1989-NMSC-010, ¶¶ 1, 3. Clark abducted the child and took her to his brother's ranch, where he raped her and shot her in the head, killing her. *Id.* Her body was discovered unclothed in a shallow grave. *Id.* ¶¶ 3-4. Clark pleaded guilty to kidnapping and first-degree murder in early December 1986 after learning that Governor Anaya intended to commute the death sentences of all persons on death row later that month. *Id.* ¶¶ 5, 7. However, the trial court refused to hold the sentencing hearing before the end of Governor Anaya's term, and Clark's case proceeded to a death penalty sentencing hearing where the jury found the aggravating circumstances of kidnapping and murder of a witness. *Id.* ¶¶ 5, 7, 54. Clark brought several appeals but ultimately instructed his attorneys to abandon his appeals for relief. Wilson, *supra*, at 271. He was executed on November 6, 2001. *Id.* Clark was out on bond when he committed this murder, having previously been convicted of raping a six-year-old girl. *Clark*, 1989-NMSC-010, ¶ 3.

**{94}** Johnny Clifford Zinn and three others kidnapped and gang-raped a woman and then shot her in the head. *Zinn*, 1987-NMSC-115, ¶¶ 1-4. Zinn initiated the murder by directing his accomplices to find a woman to be photographed during sex for a purported pornography ring. *Id.* ¶ 2. The accomplices kidnapped the victim from an Albuquerque shopping center and took her to an Albuquerque motel. *Id.* ¶ 3. Together, Zinn and his accomplices repeatedly raped the victim, "while taking turns photographing her as she was being sexually assaulted." *Id.* Zinn then directed the accomplices to take her to the Jemez Mountains and shoot her. *Id.* ¶ 4. Zinn was convicted of first-degree murder and eighteen additional felonies. *Id.* ¶ 1. The jury unanimously found the aggravating circumstances of kidnapping and murder of a witness but was not unanimous on sentencing Zinn to death. *State v. Zinn*, D-202-CR-1986-41129,

miscellaneous entry, form of finding (Sept. 30, 1986). The judge imposed a sentence of life imprisonment plus ninety-six years. *See Zinn*, 1987-NMSC-115, ¶ 1.

**{95}** Jerry Wayne Hutchinson abducted a woman from a rest stop before sexually assaulting and killing her. *Hutchinson*, 1983-NMSC-029, ¶¶ 1-3. Hutchinson and his accomplices hid at a rest stop, waiting to rob someone. *Id.* ¶ 3. The victim drove up after midnight and went to sleep in her car. *Id.* Hutchinson then used a tire buddy to break the window of her car and forced his way into her car. *Id.* After forcing the victim into his accomplice's car and driving to another location, he proceeded to rape the victim and beat her with the tire buddy before stabbing her with a butcher knife. *Id.* Hutchinson was convicted of first-degree murder, kidnapping, and armed robbery and was sentenced to life in prison plus twenty-seven years for the kidnapping and armed robbery. *Id.* ¶ 1. The jury found the aggravated circumstances of kidnapping and murder of a witness, but did not impose the death sentence. *State v. Hutchinson*, CR-80-71, verdict of the jury (3rd Dist. Doña Ana County Jan. 27, 1981).

**{96}** Travis McGuire enlisted his stepbrother in the kidnapping, rape, and murder of an Albuquerque woman. *McGuire*, 1990-NMSC-067, ¶¶ 1, 3. Planning to steal a car and leave town, McGuire approached the victim, who was sitting in her car outside of an apartment, opened the car door, forced the victim into the back seat, and ordered his brother to drive. *Id.* ¶ 4. McGuire then bound, gagged, and raped the victim as the three traveled east on I-40. *Id.* ¶ 4. He discarded the victim's clothing and purse near Moriarty, taking money from the purse. *Id.* ¶ 5. After driving further east, McGuire directed his brother to pull off on a dirt road and took the victim for a walk in the woods, where he strangled her and left her beneath a tree. *Id.* McGuire was convicted of first-degree murder, kidnapping, and criminal sexual penetration. *Id.* ¶ 1. The jury found kidnapping and murder of a witness as aggravators. *Id.* However, the jury did not unanimously agree on the death penalty. *See id.*

**{97}** Examining these four similar cases involving the same aggravating circumstances, we find no immediately discernible reason for Allen's death sentence. In three of the four cases the jury declined to impose the death sentence for crimes that were very similar to and arguably more heinous than Allen's. Only one of the comparison cases resulted in a death sentence. *Clark*, 1989-NMSC-010, ¶ 1. Therefore, in the majority of cases involving the same aggravating circumstances juries did not agree on a death sentence.

**{98}** We note that both *Allen* and *Clark* share the disturbing characteristic of murder of a child. To determine whether that factual similarity is sufficient justification for the sentencing disparity, we explore that similarity in further detail when we consider factually similar crimes in the next section of the opinion.

**{99}** In sum, neither the cases involving the same aggravating circumstances as *Fry* nor the cases involving the same aggravating circumstances as *Allen* generally resulted in death sentences. But because *Garcia* limits the pool of cases for comparison, we turn to consider the expanded pool of comparison including cases factually similar to *Fry* and

*Allen* in which the jury had the option to impose death but which did not involve the same aggravating circumstances.

## 2. Cases involving facts similar to *Fry* and *Allen* did not generally result in death sentences

**{100}** In order to ensure that we are conducting a thorough proportionality review, we now expand upon the *Garcia* approach to include factually similar cases in which the death penalty was an option. In the sentencing phases, the *Allen* jury found the aggravating circumstances of kidnapping and murder of a witness, the *Fry* jury found only the kidnapping aggravator, and both received the death sentence. Juries did not generally impose the death sentence for crimes with the same aggravating circumstances as either *Fry* or *Allen*, but juries had the option to impose the death penalty based on different aggravating circumstances in many cases involving facts similar to the facts in *Fry* and *Allen*. We therefore go beyond a strict application of *Garcia* to compare Petitioners' death sentences to the sentences imposed in cases in which the victim was a child (as in *Allen*) and in cases involving the attempt or commission of criminal sexual penetration (as in both *Fry* and *Allen*).

**{101}** By examining these cases, we can see whether juries generally imposed the death penalty in cases factually similar to *Fry* and *Allen*. We conclude from our examination that, although the death penalty was an option in many cases predicated on similar facts, the death sentence was rarely imposed. Our review of these cases does not reveal a justification for Petitioners' death sentences and instead demonstrates that Fry and Allen were singled out for the death penalty.

### a. The death penalty has not been generally imposed in cases involving a youthful victim

**{102}** We consider the age of the victim to be a salient fact in our comparative proportionality review. New Mexico prosecutors considered the age of the victim in determining whether to pursue the death penalty. Final Report, 14. The only execution to be carried since the 1979 enactment of the capital sentences scheme was for the murder of a nine-year-old girl. Wilson, *supra*, at 271; *see Clark*, 1989-NMSC-010, ¶ 3. The murder of a child can quite reasonably be classified among the most heinous crimes and is a statutorily designated aggravating circumstance in many states. *See, e.g.*, 42 Pa. Cons. Stat. § 9711(d)(16) (1999); Tenn. Code Ann. § 39-13-204(i)(7) (2011); *cf.* Ind. Code. 35-50-2-9(b)(1)(c) (2016) (specifying death eligibility for murder aggravated by a conviction of "[c]hild molesting"). In New Mexico, however, the death penalty was imposed in very few such cases.

**{103}** Of the cases involving a child victim which reached a death penalty sentencing hearing, *Clark*, *Ortega*, and *Stills*,[23] *Clark* is the only case in which a death sentence

---

[23]Because the death sentences of Jerome Martinez and Frank Martinez were not affirmed on appeal, they do not qualify for consideration under *Garcia*, 1983-NMSC-008, ¶ 34. *See Frank Martinez*, 2002-NMSC-008, ¶¶ 1-2 (vacating death sentence for murder of a twelve-year-old because the defendant was denied the opportunity to be

was ultimately imposed. As we have discussed, Ortega murdered two youthful victims—one fourteen years old, and the other twenty-one—and the death penalty was not imposed. *Ortega*, 1991-NMSC-084, ¶¶ 1-2, 4. Likewise, Stills received a life sentence for murdering his fourteen-year-old stepdaughter. *State v. Stills*, D-202-CR-1993-01065, third amended judgment, sentence, and commitment (Nov. 4, 2002). Earlier that day, the victim called her friend in tears and asked if he could come to her apartment. *Stills*, 1998-NMSC-009, ¶ 4. When her friend called back, the victim did not pick up the phone. *Id.* Paramedics found Stills engaged in mouth-to-mouth resuscitation with her lifeless body. *Id.* ¶ 2. He had strangled her with his hands and a bathrobe sash. *Id.* ¶ 13. The victim's shorts were around her ankles and her shirt was around her neck with her chest exposed. *Id.* ¶ 2. The cause of death was a severe beating to the head, and she had also sustained injuries around her face, head, and neck. *Id.* ¶¶ 2, 13. Stills later confessed to beating the victim after "she . . . said she was not going to let him 'use her' anymore." *Id.* ¶ 12. Stills was convicted of first-degree felony murder and criminal sexual penetration, as well as child abuse and tampering with evidence. *Id.* ¶ 1. The State proved the aggravator of criminal sexual penetration, but the jury did not unanimously agree on the death penalty. *Stills*, D-202-CR-1993-01065, verdict guilty and verdict not guilty (Dec. 22, 1994).

**{104}** Other offenders did not receive a death-penalty review at sentencing because—although guilty of conduct resulting in the death of a child—they were not charged with a death-eligible offense. *See, e.g.*, *State v. Jojola*, 2005-NMCA-119, ¶¶ 1-2, 4, 138 N.M. 459, 122 P.3d 43 (finding sufficient evidence to support a conviction of child abuse resulting in death where the eighteen-month-old victim died of a fractured skull but vacating the conviction on other grounds); *State v. Sheldon*, 1990-NMCA-039, ¶¶ 3, 11, 110 N.M. 28, 791 P.2d 479 (affirming a child abuse conviction where the thirteen-month-old victim died from skull fractures on both sides of her head incurred "while the side of her head was against a hard surface"). These crimes could quite reasonably be deemed among the most serious, but it is for the Legislature to define criminal penalties. *See Santillanes v. State*, 1993-NMSC-012, ¶ 41, 115 N.M. 215, 849 P.2d 358. Because the Legislature did not consider the death penalty to be an appropriate sentencing option for these cases, we do not consider them to be similar cases for purposes of proportionality review.

**{105}** We also consider cases involving an elderly victim because some prosecutors reported that the age of the victim was important in deciding whether to pursue the death penalty. Final Report, 14. Robert Henderson, Jr. beat, raped, and strangled an eighty-nine-year-old woman. *Henderson*, 1990-NMSC-030, ¶¶ 2-4. Henderson was initially sentenced to death, but his death sentence was vacated and he was resentenced to life in prison. *See State v. Henderson*, D-202-CR-1986-42080, judgment, sentence & commitment (Jan. 4, 1988) and judgment, sentence, and commitment (May 2, 1991). The victim was known for hiring transients to help with tasks

sentenced to death by a jury); *Jerome Martinez*, S-1-SC-22330, order (abating death sentence when the defendant died before his case was tested on appeal); *see also* Keith Easthouse, *Some Applaud, Some Oppose Sentence*, Santa Fe New Mexican, Apr. 29, 1994 (stating that Jerome Martinez received the death sentence for the murder of a nine-year-old).

around her home and to have welcomed them into her home to feed them. *Henderson*, 1990-NMSC-030, ¶ 3. Although Henderson claimed that he had an ongoing sexual relationship with the victim and that he blacked out during consensual sex, the victim had suffered "several blows to the head," "[h]er ribs were fractured, presumably by someone pushing on her chest or crushing her," and her vagina had been forcibly penetrated. *Id.* ¶¶ 4-5. Additionally, Henderson had entered the home through a broken window and stolen items from the victim's home. *Id.* ¶¶ 3, 5. Henderson was convicted of first-degree murder, criminal sexual penetration, kidnapping, aggravated burglary, and larceny. *Id.* ¶ 2. At his initial sentencing hearing, "the jury found three aggravating circumstances: (1) murder of a witness, (2) murder during the commission of [criminal sexual penetration], (3) murder during the commission of kidnapping." *Id.* This Court determined that the evidence was insufficient to support the kidnapping aggravator. *Id.* ¶¶ 22-23. On remand, the jury did not agree on murder of a witness as an aggravator but did find the criminal sexual penetration aggravator. *See Henderson*, D-202-CR-1986-42080, miscellaneous entries (Apr. 24, 1991). However, the jury did not reach unanimous agreement on the death penalty, *id.*, and Henderson received a life sentence. *Henderson*, D-202-CR-1986-42080, judgment, sentence, and commitment (May 2, 1991).

{106} Eddie Lee Adams raped and murdered an eighty-year-old Clovis woman and was convicted of kidnapping, criminal sexual penetration, aggravated burglary, robbery, tampering with evidence, and first-degree murder—where findings of the aggravating circumstances of murder of a witness, murder in the commission of a kidnapping, and murder in the commission of a criminal sexual penetration allowed the jury to consider the death penalty.[24] Although a death sentence was imposed, it was commuted before Adams had the chance to appeal. Wilson, *supra*, at 270 n.106; *see also Adams*, CR-86-0064 (10th Dist. Quay County Dec. 5, 1986) (waiving the right to directly appeal the judgment and sentence of death, anticipating commutation). Because Adams did not appeal, *Adams* does not qualify for consideration under *Garcia*, and we do not consider *Adams* a reliable indicator of facts warranting the imposition of the death penalty. *Garcia*, 1983-NMSC-008, ¶ 34.

{107} Of cases involving a child or elderly victim, *Clark* is the only case in which the defendant was ultimately sentenced to death. The majority of cases involving the murder of a child or elderly victim resulted in a life sentence. Because the death penalty was not generally imposed for cases involving a child or elderly victim, these cases suggest that the age of Allen's victim provides no rational justification for his death sentence and that it is therefore disproportionate.

b. **The death penalty has not been generally imposed in cases involving criminal sexual penetration**

---

[24]The supplemental briefs of Fry and Allen filed in this Court both assert these facts, which are not contested by any party, despite the unavailability of court records to support them. Nevertheless, the information is consistent with all other sources we have located concerning the charges, convictions, and sentencing of Adams.

**{108}** Because *Fry* and *Allen* were both convicted of attempted criminal sexual penetration, cases with that aggravator serve as a useful point of comparison for purposes of comparative proportionality review. New Mexico prosecutors also considered the commission of a criminal sexual penetration to be a relevant factor in deciding whether to seek the death penalty. *See* Wilson, *supra*, at 275 (stating that kidnapping, murder of a witness, and criminal sexual penetration "were the most commonly filed and continue to be the most common aggravators in penalty phase cases"). Furthermore, cases involving a criminal sexual penetration were among the most likely to proceed to a death penalty sentencing hearing. *Id.* Many cases besides *Fry* and *Allen* involved the aggravating circumstance of criminal sexual penetration, including *Clark*, *Gilbert*, *Guzman*, *Cheadle*, *Adams*, *Stills*, *McGuire*, *Henderson*, *Zinn*, *Hutchinson*, *Lovett*, *Harris*, and *Bryant*. We compare these cases to *Fry* and *Allen*.

**{109}** The death penalty was imposed in five cases involving the aggravating circumstance of criminal sexual penetration: *Clark*, *Gilbert*, *Guzman*, *Cheadle*, and *Adams*. Except for *Clark*, each of these death sentences was vacated or commuted. Exec. Orders Nos. 86-37 (Gilbert), 86-39 (Guzman), 86-41 (Adams) (Nov. 26, 1986); *Cheadle*, 1987-NMSC-100, ¶ 1 (affirming the life sentence imposed after the district court vacated the death sentence and resentenced to life). As we have discussed, *Clark* involved the rape and murder of a nine-year-old girl. *Clark*, 1989-NMSC-010, ¶ 3. William Wayne Gilbert was sentenced to death for murdering and sexually brutalizing a married couple. *See Gilbert*, 1983-NMSC-083, ¶¶ 1, 38. Gilbert entered the newlyweds' home and held them at gunpoint.[25] Gilbert then raped the wife, attempted to rape the husband, and forced the wife to penetrate herself with a wooden spoon purportedly doused in semen. *See id.* ¶¶ 36-38; Coates, *supra*. At trial, Gilbert testified that he "suffered from an irresistible urge to rape and kill." *Gilbert*, 1983-NMSC-083, ¶ 6. Gilbert was convicted of two counts of first-degree murder, two counts of kidnapping, and two counts of criminal sexual penetration. *Id.* ¶ 1. The jury found that the evidence supported a total of three aggravators: murder of a witness, and murder consistent with Section 31-20A-5(B)—which includes either criminal sexual penetration or kidnapping—with respect to both victims. *See Gilbert*, 1983-NMSC-083, ¶ 1. In addition to these murders, Gilbert was convicted of murdering his wife and another woman, for which he received sentences of life imprisonment. *See State v. Gilbert*, 1982-NMSC-137, ¶¶ 1, 4, 11, 16, 99 N.M. 316, 657 P.2d 1165 (discussing Gilbert's murder of his wife, affirming that first-degree murder conviction, and referring to the murder of the fourth victim); *see also State v. Gilbert*, 1982-NMSC-095, ¶ 2, 98 N.M. 530, 650 P.2d 814 (discussing Gilbert's murder of the fourth victim). Governor Anaya commuted Gilbert's death sentence. Exec. Order No. 86-37 (Nov. 26, 1986). The exercise of executive clemency does not render an otherwise valid death sentence unconstitutional, and we consider it a death sentence for purposes of the comparative proportionality review. *See Gregg*, 428 U.S. at 199, 203.

---

[25]James Coates, *A Governor's Fit Of Conscience Over An Unconscionable Crime*, Chicago Tribune, Dec. 7, 1986, http://articles.chicagotribune.com/1986-12-07/news/8604010437_1_noel-johnson-toney-anaya-garrey-carruthers (last visited June 4, 2019).

**{110}** Governor Anaya also commuted the death sentence of Michael Anthony Guzman. Exec. Order No. 86-39 (Nov. 26, 1986). Guzman was sentenced to death for an attempted double murder where one victim died and one victim was injured but survived. *Guzman*, 1984-NMSC-016, ¶¶ 1, 3-5. Guzman kidnapped two female college students from just outside the University of New Mexico and forced them into his vehicle at knifepoint. *Id.* ¶¶ 3, 4. The victims had been studying and went to get coffee from the Frontier Restaurant. *See id.* ¶ 3. Guzman drove the victims to a remote location, where he threatened to shoot them if they did not comply with his orders. *Id.* ¶ 4. He then ordered one victim to undress and forced the second victim into the trunk. *Id.* ¶¶ 4-5. The first victim was later found dead, having been raped and stabbed in the heart. *Id.* ¶ 7. The second victim escaped and attempted to run away; Guzman chased and stabbed her in the back, chest, and neck. *Id.* ¶ 5. As he stabbed her, Guzman remarked that "[a]ll my problems are because of you Anglos." *Id.* ¶ 5. When he left the second victim to "let her die in peace," she crawled to the highway for assistance. *Id.* Guzman was convicted of two counts of kidnapping and one count each of first-degree murder, attempted first-degree murder, criminal sexual penetration, and tampering with evidence. *Id.* ¶ 1. The jury sentenced Guzman to death based on the aggravating circumstances of kidnapping, criminal sexual penetration, and murder of a witness. *Id.* ¶¶ 17-18.

**{111}** David Leon Cheadle was sentenced to death for robbing a man and a woman at gunpoint, attempting to rape the woman, and murdering the man. *Cheadle*, 1983-NMSC-093, ¶¶ 1, 3. Cheadle ordered the two to disrobe and shot the man. *Id.* ¶ 3. Cheadle tried to rape the woman, but was unable to become aroused. *Id.* He shot the man again and then attempted to force the woman into a car, but she ran and got away. *Id.* Cheadle was convicted of first-degree murder, kidnapping, and criminal sexual penetration and was sentenced to death based on the aggravating circumstances of murder of a witness and murder in the commission of a kidnapping or criminal sexual penetration. *Id.* ¶¶ 1, 31. This Court affirmed the death sentence on direct appeal, *id.* ¶ 46, but later affirmed the life sentence imposed when the district court vacated the death sentence due to ineffective assistance of counsel. *Cheadle*, 1987-NMSC-100, ¶ 1. Because his death sentence was vacated due to ineffective assistance of counsel, *Cheadle* is not a reliable comparison case. *Id.*

**{112}** In the majority of cases involving similarly disturbing incidents of criminal sexual penetration the defendants were sentenced to life in prison, despite facing the possibility of death. *See, e.g.*, *Stills*, 1998-NMSC-009, ¶¶ 1-2, 13 (affirming a life sentence where the defendant sexually assaulted his fourteen-year-old stepdaughter before strangling and beating her to death); *McGuire*, 1990-NMSC-067, ¶¶ 1, 4 (affirming a life sentence where the defendant forced his way into the victim's car and raped her while the defendant's step-brother drove); *Henderson*, 1990-NMSC-030, ¶¶ 2-4 (reversing a death sentence imposed for the defendant's rape, murder, and robbery of an eighty-nine-year-old woman); *Zinn*, 1987-NMSC-115, ¶¶ 1-4 (affirming a life sentence plus ninety-six years where the defendant initiated the kidnapping, gang rape, sexual exploitation, and murder of the victim); and *Hutchinson*, 1983-NMSC-029, ¶ 1 (affirming

a life sentence where the defendant raped and murdered the victim after kidnapping her with the help of two others).

**{113}** Life sentences were also imposed in *Lovett*, *Harris*, and *Bryant*. Paul Wayne Lovett did not receive the death sentence for the sexual assault and murder of a young woman. *Lovett*, 2012-NMSC-036, ¶¶ 1-3, 9. Lovett was tried jointly for the unrelated murders of two young women. *Id.* ¶ 1. The first victim disappeared from her job working the night shift at a gas station in Hobbs. *Lovett*, 2012-NMSC-036, ¶ 2. Her body was discovered in a vacant field near a dirt road. *Id.* She had been stabbed fifty-six times. *Id.* ¶ 12. More than a year later, the second victim was discovered dead in a caliche pit with her shirt pulled over her head and her underwear around her ankles. *Id.* ¶¶ 3, 16. She had "suffered severe, blunt-force trauma to her head and neck," a large slash across her throat, and several injuries consistent with sexual penetration. *Id.* ¶ 15. Lovett was convicted of first-degree murder with respect to the first victim as well as first-degree murder and criminal sexual penetration with respect to the second victim. *Id.* ¶¶ 7-8. In the sentencing phase, the jury unanimously found the aggravating circumstance of murder in the commission of criminal sexual penetration for the second murder but unanimously agreed that Lovett should not be sentenced to death. *State v. Lovett*, D-506-CR-2003-00406, miscellaneous entry (Apr. 9, 2007) and miscellaneous entry (Apr. 17, 2007). Lovett received a sentence of life imprisonment for each murder. *Lovett*, 2012-NMSC-036, ¶ 9. On direct appeal, this Court concluded that the trial court committed error by failing to sever the murder charges into separate trials but that the error was harmless with respect to the murder and criminal sexual penetration of the second victim. *Id.* ¶¶ 52, 85. Accordingly, the Court reversed Lovett's conviction of first-degree murder for the first victim[26] but upheld his convictions of first-degree murder and criminal sexual penetration for the second victim. *Id.* ¶¶ 1, 86.

**{114}** Miles Harris was sentenced to life in prison for raping a woman and using her bra to strangle her to death. *Harris*, S-1-SC-23306, dec. ¶¶ 1, 3. She was found dead in her apartment, in a complex where Harris had worked as a painter. *Id.* ¶ 3. Harris's DNA and sperm were discovered on the victim, and he had a scratch consistent with fingernail marks. *Id.* ¶¶ 3, 5. Harris was convicted of first-degree willful and deliberate murder, felony murder, criminal sexual penetration, aggravated burglary, larceny, and two counts of child abuse. *Id.* ¶ 1. Harris had also stolen the victim's car and traded it for cocaine. *Id.* ¶ 4. The jury found the aggravating circumstance of criminal sexual penetration, but did not unanimously agree on the death penalty. *See State v. Harris*, D-202-CR-1992-01433, verdict guilty and verdict not guilty (Sept. 21, 1995).

**{115}** Robert Bryant was sentenced to life imprisonment for strangling a woman as he raped her. *Bryant*, S-1-SC-26112, dec. ¶¶ 1, 22, 27. The victim's body was discovered padlocked inside of Bryant's camper shell. *Id.* ¶¶ 3, 19. She was wrapped in blankets and unclothed from the waist down, with the exception of her socks and tennis shoes. *Id.* ¶ 27. A pendant had been pressed deeply into the victim's neck, which was heavily

---

[26]On retrial for the murder of the first victim, Lovett was again convicted of first-degree murder and sentenced to life imprisonment. *See State v. Lovett*, S-1-SC-34815, dec. ¶¶ 1-3 (June 2, 2016) (non-precedential); *Lovett*, D-506-CR-2003-00406, judgment, sentence, and commitment (June 17, 2014).

bruised, and her bra was sliced and pushed out of place. *Id.* ¶¶ 22, 27. Bryant's pubic hair was discovered on the victim and his sperm was still inside of her and intact, suggesting that she had been killed in intercourse and had not moved since then. *Id.* ¶ 27. Bryant "was convicted of first-degree murder, kidnapping, criminal sexual penetration, and tampering with evidence." *Id.* ¶ 1. The jury found the aggravators of kidnapping and criminal sexual penetration, but did not unanimously agree on the death penalty. *See State v. Bryant*, D-101-CR-1998-00588, miscellaneous entries (Oct. 6, 1999).

**{116}** While criminal sexual penetration was a commonly alleged aggravating circumstance, *see* Wilson, *supra*, at 274, the death penalty was imposed in very few of these cases. Our comparison of these cases has revealed that the death penalty was far from generally imposed in cases involving similarly disturbing incidents of criminal sexual penetration and that these cases provide no rational justification for Petitioners' death sentences. Taken together, the cases suggest that Fry and Allen were singled out for the death penalty and that Petitioners' death sentences are disproportionate.

### c.      Petitioners' death sentences are disproportionate

**{117}** Considering cases involving the same aggravating circumstances as well as other factually similar cases, we conclude that Petitioners' death sentences are statutorily disproportionate. As we have discussed, death sentences were not generally imposed in cases involving the same aggravating circumstances as either *Fry* or *Allen*. Neither the age of Allen's victim nor Fry's and Allen's attempted criminal sexual penetration provide justification for this sentencing disparity, as death sentences were not generally imposed by juries in cases involving similar facts.

**{118}** Out of the entire pool of reliable comparison cases for either *Fry* or *Allen*, death sentences were imposed in only three cases, *Clark*, *Gilbert*, and *Guzman*.[27] Each of these three cases involved more aggravating circumstances than *Fry* and two involved more aggravating circumstances than *Allen*. Juries found three aggravating circumstances for Gilbert and Guzman, two aggravating circumstances for Clark and Allen, and a single aggravating circumstance for Fry. *Fry*, 2006-NMSC-001, ¶ 6; *Allen*, 2000-NMSC-002, ¶ 15; *Clark*, 1989-NMSC-010, ¶ 54; *Gilbert*, 1983-NMSC-083, ¶ 1; *Guzman*, 1984-NMSC-016, ¶¶ 17-19; *Cheadle*, 1983-NMSC-093, ¶ 31; *see also* Wilson, *supra*, at 272 (analyzing the distribution of death penalty cases in New Mexico and observing that the likelihood that a defendant would be sentenced to death increased with the number of statutory aggravating circumstances). Moreover, unlike Fry and Allen, Gilbert and Guzman were sentenced to death for murdering or attempting to

---

[27]Although death sentences were initially imposed in *Adams*, *Cheadle*, and *Henderson*, none of those cases reliably support the imposition of the death penalty. *See Henderson*, 1990-NMSC-030, ¶¶ 2, 22-23 (reversing the death sentence for insufficient evidence in support of the kidnapping aggravator); *Cheadle*, 1987-NMSC-100, ¶ 1 (affirming a life sentence imposed after the district court vacated the death sentence and resentenced to life); *Adams*, CR-86-0064 (10th Dist. Quay County Dec. 4, 1986) (waiving the right to directly appeal the judgment and sentence of death, anticipating commutation).

murder two victims. *See Guzman*, 1984-NMSC-016, ¶¶ 1, 3-5; *Gilbert*, 1983-NMSC-083, ¶ 1.

**{119}** Although Section 31-20A-4(C)(4) does not require perfectly symmetrical sentencing, it does require us "to identify and invalidate the aberrant death sentence." *Clark*, 1999-NMSC-035, ¶ 80 (internal quotation marks and citation omitted). As we have explained, a death sentence is disproportionate if juries do not generally impose a death sentence for similar crimes and there is no real justification for affirming the death sentence. *Gregg*, 428 U.S. at 205-06. The death sentence was far from generally imposed in cases similar to *Fry* or *Allen* and, mindful that our role is not to conduct a traditional proportionality review, we see no real justification for this sentencing disparity. The strikingly small number of similar cases in which a death sentence was imposed leads us to conclude that Petitioners' sentences are statutorily disproportionate to the penalties imposed in similar cases.

## V.   CONCLUSION

**{120}** Ten years ago, the people of New Mexico, through their duly elected representatives in the Legislature, repealed the death penalty on a prospective basis. This historic shift in public and legislative response to the greatest punishment for the most heinous crimes compelled Petitioners to ask this Court to declare their death sentences unconstitutional. Consistent with our longstanding prudential obligation to "avoid deciding constitutional questions unless required to do so," *Allen v. LeMaster*, 2012-NMSC-001, ¶ 28, 267 P.3d 806 (internal quotation marks and citation omitted), we examine whether Petitioners' death sentences satisfy the comparative proportionality requirement under Section 31-20A-4(C)(4)—that a death sentence must not be imposed if it is disproportionate to the penalties imposed in similar cases.

**{121}** Fulfilling the legislative mandate under Section 31-20A-4(C)(4), we conduct a post-verdict comparative proportionality review of Fry's and Allen's death sentences by comparing their death sentences to the sentences imposed in similar cases. Our previous examination of Fry's and Allen's death sentences under the approach to comparative proportionality review adopted in *Garcia* consisted more of a traditional proportionality review and did not satisfy the requirement of Section 31-20A-4(C)(4). This prior approach under *Garcia* has been a subject of criticism, both by a dissenting member of the enacting Court and in a comprehensive study on the issue. Given the historic repeal of the death penalty, we cannot ignore this criticism and therefore strengthen our approach under *Garcia* to ensure that each death sentence is thoroughly compared with similar cases in which the jury had the option to impose the death penalty.

**{122}** In this opinion we apply that modified *Garcia* approach—one which better fulfills our obligation to conduct a comparative proportionality analysis of Petitioners' death sentences. Doing so, we conclude that Petitioners' death sentences do not satisfy the comparative proportionality requirement under Section 31-20A-4(C)(4). In comparing Petitioners' cases to other equally horrendous cases in which defendants were not

sentenced to death, we find no meaningful distinction which justifies imposing the death sentence upon Fry and Allen. The absence of such a distinction renders the ultimate penalty of death contrary to the people's mandate that the sentence be proportionate to the penalties imposed in similar cases. We therefore hold the imposition of the death sentence upon Fry and Allen to be disproportionate under Section 31-20A-4(C)(4), hereby vacate their death sentences, and remand for sentences of life imprisonment.

**{123}  IT IS SO ORDERED.**

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

**EDWARD L. CHÁVEZ, Justice, Retired, Specially Concurring**
**Sitting by designation**

**CHARLES W. DANIELS, Justice, Retired, Specially Concurring**
**Sitting by designation**

**JUDITH K. NAKAMURA, Chief Justice, Dissenting**

**PETRA JIMENEZ MAES, Justice, Retired, Concurring in Dissent**
**Sitting by designation**

**CHÁVEZ, Justice (specially concurring).**

**{124}**  The death penalty is the government's authority to plan and carry out the killing of a human being who is found guilty of committing a specified crime or crimes. The plan begins with legislation identifying which crimes warrant the death penalty, the procedure for finding the person guilty, the procedure for deciding whether the person should be sentenced to death, and, if sentenced to death, the method by which the person will be killed. There are limits on the government's authority.

**{125}**  The government must plan and carry out the killing consistent with both the United States and New Mexico Constitutions. The United States Constitution dictates the minimum constitutional protections available to the person the government is planning to kill. The New Mexico Constitution can require greater protection for that person, but cannot require less protection. Legislation may also require greater protections for the person subject to the death penalty beyond what is required by either constitution.

**{126}**  This case is not about constitutional protections. This case is about an additional protection required by the New Mexico Legislature. The protection is the requirement that the New Mexico Supreme Court automatically review a death sentence for, among other things, whether "the sentence of death is excessive or disproportionate to the

penalty imposed in *similar cases*, considering both *the crime and the defendant*."[28]  The Legislature did not define what it meant by "similar cases" or detail how it intended this Court to fulfill its responsibilities.  To determine whether the sentence of death is excessive or disproportionate to the penalty imposed in "similar cases" we must consider the jury verdict in the cases we are comparing.  Our review of the jury verdicts is not for the purpose of questioning the integrity of the jury or whether they were serious about their responsibilities.  I am confident the juries in each of the cases we must review and compare took their responsibilities with the gravity and seriousness the task required, even though some juries voted to sentence the defendant to death and other juries did not impose the death penalty. The Legislature insisted that this Court consider the penalty imposed by multiple juries because it expected the Court to reverse a death penalty if the Court's review reveals that multiple juries in similar cases did not impose the death penalty and there is no justification for the disparity.  Similarly, if the Court's review revealed that the death penalty has been imposed in similar cases, the Legislature would expect this Court to affirm the death penalty.

**{127}**  By necessity we must look at the facts in the case we are reviewing and in the case or cases we are comparing.  Otherwise, we would not be able to determine whether the comparison cases are "similar cases,"  nor would we be able to compare the defendant and the crime in the comparison cases to the defendant and the crime in the case under review.

**{128}**  It seems obvious that a "similar case" would include cases where the victim was murdered.  However, a death sentence can only be imposed if the judge or jury finds that the defendant murdered the victim under at least one of the following aggravating circumstances: 1) the victim was a peace officer acting in the lawful discharge of an official duty when murdered; 2) the murder was committed with the intent to kill in the commission or attempt to commit a) kidnapping, b) criminal sexual contact of a minor, or c) criminal sexual penetration; 3) the murder was committed by a defendant attempting to escape a penal institution; 4) the defendant, while incarcerated, murdered a person who was incarcerated or who was lawfully on the premises of the penal institution; 5) the defendant, while incarcerated, murdered an employee of the penal institution; 6) the defendant was hired to murder the victim; or 7) the defendant murdered a witness to prevent the witness from testifying or in retaliation for that testimony.[29]  Murders occur under circumstances that would not fit within any of these seven categories.  It would not be appropriate for us to consider all murder cases in our comparisons because the defendants in those cases, for policy reasons, did not risk a death sentence.  Logically, we could consider other cases where the facts indicate that the defendant committed a murder that could fit within any of these seven categories but the prosecutor chose not to pursue the death penalty.  Justice Vigil rejects such a broad review.

**{129}**  Instead Justice Vigil narrows the focus by limiting our review to cases in which the jury had to decide whether to impose a death sentence in a case involving the same aggravating circumstance and in which the facts are similar to the case we are

---

[28]*See* Section 31-20A-4(C)(4) (1979, repealed 2009) (emphasis added); *Garcia*, 1983-NMSC-008, ¶¶ 33-34.
[29]Section 31-20A-5.

reviewing. This review eliminates the countless cases with similar facts where the prosecutor could have asked a jury to consider the death penalty under the same aggravating circumstance, but instead chose to pursue life in prison as the maximum sentence. For example, when a defendant is alleged to have killed a person during the course of attempting to or actually kidnapping or raping the victim, the prosecutor could choose to prosecute the defendant for first-degree murder but not seek the death penalty, in which case the maximum possible sentence for the murder would be life in prison. Excluding these cases from our review of "the penalty imposed in *similar cases*, considering both *the crime and the defendant*"[30] could be criticized because excluding these cases arguably skews the analysis in favor of the death penalty. I agree with Justice Vigil's approach because it is tailored to consider the specific aggravating circumstance at issue in the cases yet permits this Court to look at the totality of the circumstances in the cases to determine whether there is a justification for the death penalty in one case and not another. If in the future the Legislature reimposes the death penalty it may broaden the scope of our comparative proportionality review or eliminate the requirement of a comparative review altogether. A traditional proportionality review required by the United States Constitution, which is very different from the proportionality review required by the Legislature, will still be required.

**{130}** I also understand that the review we undertake expands, although slightly, the analysis previously employed by this Court when performing a comparative proportionality review. I agree with the need to expand the review, particularly because Governor Richardson, when signing the repeal of the death penalty, squarely called into question whether the criminal justice system in New Mexico can be trusted to properly carry out the death penalty. Governor Richardson stated he signed the legislation because he lacked "confidence in the criminal justice system as it currently operates to be the final arbiter when it comes to who lives and who dies for their crime." *See* Press Release, Governor Bill Richardson Signs Repeal of the Death Penalty (Mar. 18, 2009), *available at* http://www.deathpenaltyinfo.org/documents/richardsonstatement.pdf. Governor Richardson also noted that in New Mexico four individuals who were sentenced to death later had the charges against them dismissed. *Id.*

**{131}** The criminal justice system includes law enforcement, prosecutors, public and private defenders of an accused, penal institutions, trial courts, and appellate courts. This Court has the responsibility to assure that criminal justice stakeholders adhere strictly to 1) the United States and New Mexico Constitutions; 2) obligations imposed on the system by the Legislature; and 3) procedures required by this Court under its power of superintending control. As it specifically relates to the death penalty, this Court is the only court that has the authority and responsibility to determine whether the sentence of death is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Section 31-20A-4(C)(4). I am persuaded that our prior approach has been too narrow and, therefore, agree with the detailed approach taken by Justice Vigil and the result she reaches.

---

[30]Section 31-20A-4(C)(4) (emphasis added).

**{132}**  The result in this case means that both Allen and Fry will have their death sentences reduced to life in prison.  Under the law, they will be entitled to a parole hearing after thirty years.[31]  Being entitled to a  parole hearing does not mean that they will be released  from prison.  The parole board must consider the circumstances of the crime, mitigating and aggravating circumstances, and other information when deciding whether parole is in the best interests of society, Fry, and Allen, and whether they are able and willing to be law-abiding citizens.  If the parole board rejects parole, Fry and Allen are only entitled to another parole hearing every two years until they are paroled. NMSA 1978, § 31-21-10(A) (1994); NMSA 1978, § 31-21-10(A) (1997).  Once paroled from their life-in-prison sentences, Allen and Fry will immediately begin serving additional prison sentences that were ordered to run consecutive to their death sentences. NMSA 1978, § 31-21-11 (1982).

**{133}**  Allen was thirty-four years old at the time of his trial in 1995.  *Allen*, 2000-NMSC-002, ¶ 81.  He was sentenced to death for the one murder. If Allen's only sentence was the death sentence—now life in prison—he would be entitled to a  parole hearing after thirty years.  However, the judge imposed a twenty-five-year sentence on Allen for other crimes he committed at the time of the murder and required the twenty-five year sentence to be served in addition to the sentence for the murder.[32]  Allen will have to begin serving the twenty-five year sentence if and when the parole board paroles him from his life sentence.

**{134}**  Fry, who was born August 18, 1973, faces a minimum sentence of one-hundred-twenty years just for his life sentences, which run consecutively to the first sentence imposed on Fry.[33]  Fry will never be eligible for release from prison.

**{135}**  For all of the foregoing reasons, I concur with the analysis and result reached by Justice Vigil.

**EDWARD L. CHÁVEZ, Justice, Retired**
**Sitting by designation**

**DANIELS, Justice (specially concurring).**

---

[31]*Compton v. Lytle*, 2003-NMSC-031, ¶ 1, 134 N.M. 586, 81 P.3d 39 *as modified by State v. Tafoya*, 2010-NMSC-019, ¶ 16, 148 N.M. 391, 237 P.3d 693.

[32]Allen was sentenced to death for first-degree murder, twenty-five years for kidnapping resulting in great bodily harm, and thirteen years for attempted criminal sexual penetration resulting in great bodily harm. *State v. Allen*, D-1116-CR-9500014, judgment, sentence, and commitment (Dec. 22, 1995). The latter two sentences were merged and run concurrently to each other but run consecutive to the sentence for the murder conviction.  *Id.*

[33]Including the death sentence reduced to a life sentence in this case, Fry has been sentenced to life in prison four times. *State v. Fry*, D-1116-CR-2000-00513, judgment, sentence, and commitment (Apr. 24, 2002) (sentencing Fry to death); *Fry*, D-1116-CR-2000-00542, judgment, sentence, and commitment (Nov. 20, 2003) (sentencing Fry to life in prison for first-degree murder, to run consecutively to the sentence in *Fry*, D-1116-CR-2000-00513); *State v. Fry*, D-1116-CR-2000-01055, judgment, sentence, and commitment (Feb. 25, 2005) (sentencing Fry to two sentences of life in prison for two counts of first-degree murder, to run consecutively to each other and to the sentences imposed in *Fry*, D-1116-CR-2000-00513 and *Fry*, D-1116-CR-2000-00542).

**{136}** The opinion of the Court undertakes a cautious exercise of our exclusive statutory responsibility under the Capital Felony Sentencing Act to ensure that a defendant is not put to death if that sanction "is . . . disproportionate to the penalty imposed in similar cases," Section 31-20A-4(C)(4) (1979, repealed 2009). In doing so, it avoids at least some of the clear inequities that resulted from the narrow strictures of the majority opinion in *Garcia*, 1983-NMSC-008.

**{137}** Because we resolve this case on statutory grounds, there is no need for us to reach further and decide in a precedential opinion whether the inconsistent administration of our death sentence statutes also violates state constitutional guarantees, as the Connecticut and Washington Supreme Courts recently have ruled. *State v. Santiago*, 122 A.3d 1, 73 (Conn. 2015) (striking down further Connecticut executions on state constitutional grounds following prospective repeal of capital punishment where "the number of executions compared to the number of people who have been sentenced to death is minuscule"); *State v. Gregory*, ___ Wash. 2d ___, ¶ 1, 427 P.3d 621 (2018) (holding the death penalty unconstitutional on state constitutional grounds because of "the arbitrary manner in which the death penalty is generally administered" in Washington). But if we had not resolved this case on a narrow statutory analysis, we would have been compelled to undertake a traditional constitutional proportionality review. It is difficult to imagine a justification that would find constitutional the disproportional manner in which New Mexico has administered the death penalty under the 1979 Act.

**{138}** As judges, of course, we should not substitute our own personal political, philosophical, or moral views about the death penalty for lawful statutory or constitutional mandates. Members of our society and polity have expressed a number of sharply differing views on the death penalty, ranging from a view that evolving standards of civilization and decency have rejected killing at the hands of the state to a view that exacting an eye for an eye and a tooth for a tooth is an appropriate justification for the state's extermination of murderers. As judges we should not presume to make those choices—either way—for the citizens of our self-governing democracy. Our focused responsibility is to make sure the law is applied according to statutory and constitutional requirements, including those that incorporate the ultimate precept of equal justice summarized in the inscription behind our bench, "Dedicated to the Administration of Equal Justice Under Law," and the similar expression, "Equal Justice Under Law," that is chiseled into the marble above the doors of the United States Supreme Court. We are also bound by the specific statutory task the New Mexico Legislature has assigned to us with regard to the imposition of the death penalty in this state, to ensure that our justice system does not arbitrarily put to death a few defendants and not the majority of equally eligible others, under either a statutory or constitutional analysis.

**{139}** Theory often fails to foresee reality. Any expectations of a fairly administered death penalty scheme the drafters of the Act may have entertained forty years ago proved in practice to be wrong. And whatever future the *Garcia* majority may have anticipated in creating a method for trying to comply with our then-new proportionality

oversight responsibility, decades of real-life experience have now demonstrated that its technical limitations focused so narrowly on individual categorical exclusions from the proportionality analysis that it failed to anticipate the complete picture of the inconsistent administration of the death penalty that emerged so clearly over the subsequent years for defendants who committed their crimes between 1979 and 2009, when the Act was in effect.

**{140}** Our justice system, our citizens, and our public officials in all three branches of New Mexico government for decades often talked the talk of having an equitable and constitutional capital punishment policy but collectively never found themselves willing to walk the walk. Despite the commission of hundreds of brutal, cold-blooded, and deliberate first-degree murders of adult and child victims, our state has executed a total of one of those murderers over the course of decades, a unique defendant who waived both his trial and then his habeas corpus review before this Court, submitting voluntarily to becoming the only person executed by the New Mexico justice system in well over half a century. *See* Jolene Gutierrez Krueger, *Recalling the Last Execution in New Mexico*, Albuquerque Journal, August 24, 2016, available at https://www.abqjournal.com/832100/remembering-the-last-killer-put-to-death-in-new-mexico.html (last visited December 20, 2018).

**{141}** Other than the uniquely anomalous case of Mr. Clark, even those very few defendants whose cases were deemed on direct appeal to be theoretically appropriate under the narrow *Garcia* limitations to be used as comparisons for proportionality, including Mr. Garcia himself, were all ultimately spared by our state from execution of the death penalty. And despite the "grandfather" clause in the death penalty repeal retaining, at least on paper, the 1979 provisions for execution of murderers who committed their crimes before the 2009 repeal, the reality is that in almost a decade since the repeal the number of first-degree murderers who have been either sentenced to death or executed has been exactly zero, including the defendant for whom the grandfather clause was primarily created. *See* Dave Maass, *Lethal Invective: Accused Cop Killer Michael Astorga Talks Death Penalty Politics*, Santa Fe Reporter, March 17, 2009, available at https://www.sfreporter.com/news/2009/03/17/lethal-invective/ (last visited December 20, 2018). Despite having been convicted of the cold-blooded and deliberate execution of a young officer making a routine traffic stop and despite being eligible for the death penalty under the 2009 prospective repeal of the 1979 Act, Michael Astorga was sentenced to life in prison because the sentencing jury did not impose the death penalty. *Astorga*, 2015-NMSC-007, ¶¶ 1-2.

**{142}** The disproportionality of New Mexico's administration of the death penalty may be explained in part, but not excused, by the fact that various actors exercising authority of our entire state justice system, and not just individual jurors, have participated in creating the inconsistent application of the death penalty. There are sound policy reasons why each of those actors should have nonreversible discretion to extend mercy, whether in jury verdicts that spare a defendant from either a conviction or death sentence, or decisions of prosecutors to bargain death off the table or not to seek it at all, or the historic and constitutional authority of governors to commute death sentences

that have been returned by juries and upheld by courts on appeal. But when the collective result of all the actions taken under authority of our state justice system is that one or even three cold-blooded murderers out of hundreds are executed by the state while the equally culpable majority are spared, our state cannot honestly claim it has imposed the death penalty in a proportionate manner.

**{143}** A killer's crimes reflect who he is. What we do to the killer reflects who we are. Can we really look anyone in the eye and say that executing these two defendants would be proportionate when compared to non-deadly punishment our state has overwhelmingly meted out in virtually all equally serious first-degree murder cases, and specifically in similar cases, since enactment of the Capital Felony Sentencing Act in 1979? I, for one, cannot honestly do so. I CONCUR in the judgment of the Court.

**CHARLES W. DANIELS, Justice, Retired**
**Sitting by designation**

**NAKAMURA, Chief Justice (dissenting).**

**{144}** The Majority's position—executing Fry and Allen would be immoral, unethical, and unjust given the rarity with which murderers in New Mexico are put to death—has appeal at some very basic level. But I must respectfully dissent. I do not know if executing Fry and Allen would be immoral, unethical, or unjust. I know only that a jury comprised of women and men from our state concluded that Fry and Allen forfeited their right to continue living among us for brutally killing innocent and by all accounts gentle and caring women. I am certain also that the jurors assembled to sentence Fry and Allen took their responsibilities to decide Fry's and Allen's fate with the gravity and seriousness the task required.

**{145}** The legislative command that this Court assure that Fry's and Allen's death sentences are not "disproportionate to the penalty imposed in similar cases" should not be construed in the way embraced by the Majority. Section 31-20A-4(C)(4) (1979, repealed 2009). They perceive in that language authority to conclude that, because so few offenders in New Mexico have ever been sentenced to die, no offenders shall ever again be sentenced to die in New Mexico. I respectfully contend that the Majority's judgment is error.

**{146}** Our Legislature created a refined category of death-eligible crimes and gave to capital-sentencing juries guided discretion to decide the fate of those who offend community norms in the most egregious ways. These facts must play some role in our construction of Section 31-20A-4(C)(4). *State v. Garcia*, 1983-NMSC-008, 99 N.M. 771, 664 P.2d 969, does this and correctly construed that language to require us to do no more than evaluate whether there is some precedent for the death sentence and to assure ourselves that the sentence is not excessive in light of the nature of the crime. To do anything more than this intrudes upon the capital-sentencing jury's rightful, constitutional authority to extend mercy or impose death.

**{147}**  The Majority strays beyond the limited authority granted us under Section 31-20A-4(C)(4) and overrules the decision of previous members of this Court on inescapably subjective questions.  They do this despite the fact that there has been no change in the law since the proportionality of Fry's and Allen's death sentences were previously considered, and there have been no inroads made about how to measure the proportionality of any given death sentence.

**{148}**  The legislative repeal of the death penalty is not support for the Majority's arguments or outcome.  The repeal was achieved through a compromise that required Fry and Allen to submit to their death sentences.  It in no way suggests the Legislature has doubts about our comparative proportionality methodology or our assessment of the proportionality of Fry's and Allen's death sentences.

**{149}**  These general thoughts guide this dissent.  In what follows, I explain my position in much greater detail.  A series of preliminary points are addressed first to dispose of several arguments the Majority makes and that are irrelevant to the statutory and constitutional questions at issue here.  Discussion there follows.

## I.      PRELIMINARY POINTS

### A.      Sentence Versus Execution

**{150}**  The Majority emphasizes that only one individual has been executed in New Mexico since the enactment of the Capital Felony Sentencing Act (CFSA).  *Maj. Op.* ¶¶ 28, 35, 37, 93, 109; *Concurrence* ¶¶ 140-141.  This is inapposite.  We must determine if the *"sentence* of death" in any particular case is "disproportionate."  Section 31-20A-4(C)(4) (emphasis added).  Our focus is on the "sentence" imposed and not on whether the individual sentenced to die is actually executed.

### B.      "Heinous Crimes" and "Aberrant" Juries

**{151}**  The Majority focuses on whether Fry's and Allen's crimes were "the most heinous" and whether their juries acted "aberrantly" by imposing death sentences.  *See Maj. Op.* ¶¶ 1, 17, 66, 71, 73, 77, 90 n.22, 97, 102, 119, 120.  The words "most heinous" and "aberrant" are not value neutral and inject normative considerations into this matter in a way that is troubling and problematic.

**{152}**  The CFSA does require us to consider whether sentencing disparities have occurred in the capital context.  But this is a task very different than that in which the Majority is engaged.  They are asking whether Fry's and Allen's crimes were sufficiently "heinous" to justify their death sentences and whether their juries' decisions to impose the death penalty were "aberrant."  This is error.  We are not and should never attempt to be "finely tuned calibrator[s] of depravity, demarcating for a watching world the various gradations of dementia that lead men and women to kill their neighbors." *Godfrey v. Georgia*, 446 U.S. 420, 456 n.6 (1980) (White, J., dissenting).  The language

the Majority employs and the analysis in which it engages indicates that this is precisely what they are doing.

## C. *Gregory* and Race-Based Imposition of Capital Punishment

**{153}** The Majority states that we are here "faced with similar concerns regarding proportionality review" that prompted the Washington Supreme Court in *State v. Gregory*, 427 P.3d 621 (Wash. 2018), to declare that its capital punishment statute violates Washington's state constitution. *Maj. Op.* ¶ 41. In *Gregory*, the evidence indicated that black defendants were four-and-a-half times more likely than white defendants to be sentenced to death in the state of Washington. 427 P.3d at 630. The Washington Supreme Court was satisfied that "the association between race and the death penalty" could not be "attributed to random chance" and concluded that Washington's capital-punishment system is constitutionally intolerable as it is racially biased. *Id.* at 635-36. The court addressed comparative proportionality review only insofar as the court was unpersuaded that it was a tool capable of ameliorating the broad and fundamental discrimination worked by Washington's capital-punishment statute. *Id.* at 637. Comparative proportionality review, the court explained, was simply too subjective and too case-specific to adequately "fix the constitutional deficiencies" confronted. *Id.* The concerns underlying *Gregory* are not at all present here.

**{154}** To the best of my knowledge, only one author has been willing to suggest that, in New Mexico, "race and ethnicity play[] a role in determining who w[ill] live and who w[ill] die." Marcia J. Wilson, *The Application of the Death Penalty in New Mexico, July 1979 Through December 2007: An Empirical Analysis*, 38 N.M. L. Rev. 255, 283 (2008). That author made clear, however, that her observations were not the result of professional, statistical inquiry and she conceded that the data she reviewed and the methodologies she employed to review it "do[] not 'statistically prove' anything." *Id.* at 259-60. The State Bar of New Mexico, Task Force to Study the Administration of the Death Penalty in New Mexico, Final Report, 18 (Jan. 23, 2004), discusses evidence that race plays some role in the imposition of the death penalty nationally, *see id.* at 13, but the report does not claim that race plays a factor in death sentencing in New Mexico. *See id.* at 14-15.

**{155}** There is no evidence that Fry's and Allen's death sentences were imposed as a consequence of Fry and Allen's race or the race of their victims. Fry and Allen are both white, non-Hispanic; Fry's victim was a woman of mixed ethnicity and was part Navajo, and Allen's victim was white, with no evidence that she was an ethnic minority. We are not presented here with circumstances equivalent to those the Supreme Court of Washington confronted in *Gregory*. This case is different.

## II. DISCUSSION

**{156}** The question here is whether the Court should overturn the judgment of previous members of this Court who concluded that Fry's and Allen's death sentences are not comparatively disproportionate. We should not for the following reasons: (A) the capital

sentences imposed by Fry's and Allen's respective sentencing juries were neither excessive nor disproportionate given the facts and severity of Fry's and Allen's crimes; (B) the parties did not ask us to reconsider *Garcia*; (C) the Majority misinterprets the federal constitutional principles it cites as grounds compelling reconsideration of *Garcia*; (D) competing concerns within the CFSA counsel against the revised approach to comparative proportionality review embraced by the Majority; (E) *Garcia* correctly construed Section 31-20A-4(C)(4), it was sensibly applied in Fry's and Allen's cases, and that construction is entitled to deference under stare decisis; and finally, (F) revisiting the comparative proportionality of Fry's and Allen's death sentences violates principles of finality.

## A.      The Facts and Severity of Fry's and Allen's Cases

**{157}** It is essential to begin with the facts of Fry's and Allen's crimes because proportionality review "is first and foremost directed to the particular circumstances of a crime and the specific character of the defendant." *Garcia*, 1983-NMSC-008, ¶ 40. It is also settled law that the question whether any given death sentence is comparatively disproportionate cannot be assessed unless and until all of the facts that gave rise to the sentence—the "baseline" for comparison—are thoroughly understood. *State v. Addison*, 7 A.3d 1225, 1253 (N.H. 2010); *State v. Guzman*, 1984-NMSC-016, ¶ 33, 100 N.M. 756, 676 P.2d 1321. This requires scrutiny of the entire record including the aggravating and mitigating circumstances presented to the capital-sentencing jury. *See Addison*, 7 A.3d at 1253; *State v. Wyrostek*, 1994-NMSC-042, ¶ 12, 117 N.M. 514, 873 P.2d 260.

## 1.      The facts of Fry's case

**{158}** On the night of June 8, 2000, Fry bragged to companions that he was "wearing an eight-inch bowie knife" and intended to "stick someone." Fry encountered Betty Lee, a woman in her thirties and a mother of five, by pure chance at a convenience store at approximately 2:00 a.m. on June 9, 2000. Fry and Betty had never met before.

**{159}** Betty was using a pay phone, was emotionally distraught, and stranded. Fry was driving a vehicle and was accompanied by one male companion, Leslie Engh. Fry offered Betty a ride home, and she accepted.

**{160}** Fry drove away from the store with Betty and Engh and turned off the paved roadway and onto a dirt road that led out into the desert. Fry claimed that he needed to urinate and drove a "pretty good" distance away from the paved road. Betty sensed something was not right, and when Fry stopped the car, exited, and began urinating, she also exited the vehicle and began walking back towards the paved road. Fry reentered his vehicle, drove alongside Betty, and coaxed her back in.

**{161}** After Betty reentered the car, Fry drove some distance further, then stopped, and dragged Betty out of the car by her hair. A struggle ensued and Fry summoned Engh to hold Betty's legs, which Engh did. Fry then attempted to take off Betty's shirt, but she

kicked him. Fry drew his bowie knife and "slammed" it into Betty's chest. The knife traveled two inches into Betty and penetrated her breast bone and heart sac. She fell to the ground and Fry and Engh attempted to pull off her pants. As they did this, Betty yelled at the men "why are you doing this to me?" She then removed the knife from her chest, threw it into a ravine, broke free, got to her feet, and started running.

{162} As she ran, Betty screamed loudly at a high pitch. Her shirt was around her neck and her chest exposed. Fry chased her, caught her, and then the two men succeeded in pulling off her pants. After they disrobed her, Betty once more broke free and again started running. At this point, she was completely naked.

{163} Fry instructed Engh to find the knife and Fry obtained a sledgehammer from the car. As Engh searched in bushes with a flashlight for the knife, he saw Fry swinging the sledgehammer in the distance. Betty's screaming came to an end.

{164} Fry struck Betty on the head three to five times with the sledgehammer. The wounds the blows inflicted indicated that Betty had been facedown on the ground when she was struck. Her scalp was torn, her skull split, and her brain lacerated. These blows, in conjunction with the stab wound, caused her death.

{165} After Fry killed Betty, Fry and Engh dragged her corpse by its wrists to some bushes by a ravine, an area where they believed it would not be discovered. Engh did not want to look at the corpse but did and saw that the face was covered in blood and the hair was "in all sorts of different funny directions." They kicked Betty's clothes "off towards the edge of the ravine" so that they too would not be discovered.

{166} Fry and Engh drove away from the scene of the murder, but their car became stuck in "a wash." Fry contacted his parents on his cell phone. It was nearly 4:00 a.m. Fry's parents, oblivious to what Fry and Engh had just done, met the men at the paved roadway.

{167} Betty's corpse was discovered by a lineman later that morning. When questioned by the police, Fry denied any involvement in the killing. He did not testify at trial. The evidence presented to Fry's jury overwhelmingly demonstrated that Fry had killed Betty. Engh testified as a witness for the State and provided the testimony that serves as the principal foundation for the narrative produced above.

{168} After Fry's jury returned a guilty verdict, several of Betty's siblings and children offered victim impact testimony at the sentencing phase of the proceedings. The general thrust of that testimony was that Betty had been a kind and generous woman, that Betty's family was greatly distressed by the thought of the terror she experienced at the time of her death, and that the family's grieving and loss was profound. The sole aggravating circumstance found by the jury was that Fry perpetrated his murder in the course of a kidnapping. *State v. Fry*, 2006-NMSC-001, ¶ 6, 138 N.M. 700, 126 P.3d 516.

**{169}** Four witnesses presented mitigating evidence for Fry. *Id.* ¶ 46. A psychologist stated that it was unlikely Fry would engage in additional violence in prison. A pastor stated his belief that Fry had grown spiritually since being incarcerated. Fry's mother and father indicated a desire to continue knowing their son and spoke of his interests and community involvement. The trial judge informed the jury that, if Fry received a prison sentence for his crimes, he would be imprisoned for a minimum of sixty-seven years.

### 2. The facts of Allen's case

**{170}** On February 7, 1994, Allen happened to encounter Sandra Phillips as Sandra walked through Flora Vista, New Mexico to complete an errand and apply for a job at a local restaurant. *State v. Allen*, 2000-NMSC-002, ¶ 2, 128 N.M. 482, 994 P.2d 728. They did not know each other. At that time, Sandra was seventeen years old and had just moved home to live with her mother. Allen thought Sandra was "cute" and "good looking," and he "liked her red hair." Allen and Sandra spoke and then, for reasons unknown, Sandra entered Allen's truck.

**{171}** Allen drove Sandra out into the hills "because he wanted to make love to her." He tied a rope around Sandra's neck "so he could control her while he made love to her." Initially, the rope was wrapped around Sandra's neck three times and then knotted. Allen tightened the rope to a point that it cut off the blood supply to Sandra's brain. Sandra struggled with Allen for about thirty seconds as he attempted to rape her, but she lost consciousness and went limp. Allen pulled Sandra's blouse over her chest, removed Sandra's left boot, and then removed Sandra's left leg from her pants and underwear. Even though Sandra was unconscious, she was still breathing. Allen wrapped the rope around her neck a fourth time and again knotted it. Sandra died one to two minutes after losing consciousness. She was slowly strangled to death. In the course of the struggle, Allen sustained a facial scratch and a bruised lip. *Id.* ¶ 5.

**{172}** After murdering Sandra, Allen put her half-naked corpse in a ditch three-and-one-half miles from Flora Vista. *Id.* ¶ 3. The evidence indicated that the killing occurred somewhere other than where the body was discovered. *Id.* ¶ 7. Allen cleaned his truck to eliminate any evidence of the murder. Sandra's corpse remained in the ditch until it was discovered by a shepherd six weeks later. *Id.* ¶ 3. The jury was shown sixteen photographs of Sandra's half-naked, decaying corpse.

**{173}** When the police informed Allen that they suspected he killed Sandra, Allen informed them that the perpetrator was, in fact, a man named David Anderson from Jemez Springs. Yet, Allen told his wife and others that he raped and then killed Sandra in order to prevent her from reporting the rape and expressed to others that he thought he would not be convicted for the crime.

**{174}** At the sentencing phase, the jury learned that Allen had taken measures to silence other women he had victimized. The jury was informed that, in the 1980s, Allen stole money from a woman and, when she confronted him about the theft, he grabbed

her by the throat, pushed her against a wall, and threatened to kill her if she reported the incident to the police. Allen was imprisoned for this conduct. *Id.* ¶ 80. This testimony in conjunction with Allen's statements to his wife and others that he raped Sandra and then killed her to prevent her from reporting the rape formed the basis for the jury's finding that Allen killed Sandra with the aggravating circumstance that he murdered to silence a witness. *Id.* ¶¶ 79-80. At the sentencing hearing, Sandra's mother and a family friend testified, and a short video of Sandra on a camping trip was played for the jury. *Id.* ¶¶ 56-58. This evidence was, by all accounts, particularly forceful and established that Allen's actions irreparably wounded Sandra's family and friends. *See id.* at ¶ 145 (Franchini, J., partial concurrence and partial dissent).

{175} Allen also spoke to the jury at sentencing. *Id.* ¶ 82. He offered mitigating evidence on his own behalf, the only mitigating evidence presented. *Id.* He "sobbed," "cried," and told the jury "he was sorry for the pain he had caused."

## B. The Parties Did Not Ask Us to Reconsider the Merits of *Garcia*

{176} Neither Fry nor Allen raised the issue of the validity of the comparative proportionality methodology embraced in *Garcia* until this Court directed them to do so. Fry and Allen argued that executing them after the legislative repeal of the death penalty would constitute cruel and unusual punishment in violation of the Eighth Amendment and deprive them of the equal protection of law. The Court declined to answer these questions and, instead, directed the parties to submit briefs about the merits of *Garcia* and the merits of this Court's application of the principles articulated in *Garcia* in Fry's and Allen's direct appeals. This is troubling.

{177} "The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *Carducci v. Regan*, 714 F.2d 171, 177 (Scalia, Circuit Justice, D.C. Cir. 1983) (opinion for the court by Scalia, J.). "[W]e follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). "[Courts] do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties." *Id.* at 244 (internal quotation marks and citation omitted).

{178} I am not arguing that this Court is without power to independently exercise its authority and decide questions not briefed when it is prudent and necessary to do so. I have advocated for and have done just this. Rather, I contend that we should not reach issues not raised by the parties and not implicated by their arguments. And this is particularly true where doing so requires us to reverse the decisions of prior members of this Court on questions that are, as will be shown, inescapably subjective and based on settled law.

## C. Federal Constitutional Principles

**{179}** The Majority justifies its decision to direct this litigation to *Garcia* and comparative proportionality review because, in their view, the construction of Section 31-20A-4(C)(4) embraced in *Garcia* does not uphold the "promises of the United States Constitution" and is "insufficient to eliminate the possibility of an arbitrary and capricious sentence, contrary to *Furman*." *Maj. Op.* ¶¶ 12, 34. "*Furman* and *Gregg*," they contend, "require more." *Maj. Op.* ¶¶ 74-75.

**{180}** The Majority misinterprets the United States Supreme Court's case law on capital punishment and comparative proportionality review and wrongly concludes that this Court is required to ensure a form symmetry in the capital sentencing context that is not required. As we shall see, the federal Constitution does not forbid the application of the death penalty simply because other defendants who committed superficially similar crimes did not receive death sentences. The Supreme Court's case law points in the opposite direction.

**{181}** "The origins of the [Supreme] Court's death penalty reform efforts can be  traced to 1932, when it ruled [in *Powell v. Alabama*, 287 U.S. 45 (1932)] that state criminal defendants have a right to appointed attorneys in capital cases." Robert A. Burt, *Disorder in the Court: The Death Penalty and the Constitution*, 85 Mich. L. Rev. 1741, 1743 (1987). From 1932 until the 1960s, the "prehistory of death penalty jurisprudence," it "seemed unlikely . . . that a constitutional claim against the death penalty as such would ever gain serious attention." *Id.* at 1744. This stems, in part, from the fact that "[t]he very text of the Constitution seemed to conclude the matter with the fifth amendment's explicit, though backhanded, endorsement that a person might be deprived of life so long as due process of law was observed." *Id.* (internal quotation marks and citation omitted). The view that the Court would not meaningfully question the constitutionality of capital punishment was confirmed by *McGautha v. California*, 402 U.S. 183 (1971).

**{182}** In *McGautha*, the Court considered whether a defendant's "constitutional rights were infringed by permitting the jury to impose the death penalty without any governing standards." *Id.* at 185. The Court concluded that standards were not required by the Federal Constitution. *Id.* The reader, wondering how such a holding could be when not a year later in *State v. Furman*, 408 U.S. 238 (1972), the Court reached the exact opposite conclusion, must know "that the Court had specifically restricted the grant of certiorari in *McGautha* to a due process challenge and in *Furman* the logically distinct 'cruel and unusual punishment' issue was addressed." Burt, *supra*, 1755 (internal quotation marks and citations omitted). If this explanation seems unsatisfactory, the reader may be consoled by the fact that others felt this way too.

**{183}** Justice Douglas openly questioned, in *Furman*, how the textual source of the right could explain the obvious tension between *McGautha* and *Furman*. *Furman*, 408 U.S. at 248 n.11 (Douglas, J., concurring). And, "[o]f the Justices who participated in both *McGautha* and *Furman*, four (including Brennan) took apparently inconsistent positions in the two cases." Burt, *supra*, at 1754. This logical difficulty need not be worked out, it need only be noted.

**{184}** *Furman* was issued only one year after *McGautha* and, as is well known, it is comprised of nine separate opinions. Every Justice on the Court wrote. "[T]he majority 'opinion' in [*Furman*] is a one-paragraph per curiam invalidating under the Eighth Amendment the death sentences imposed on the three petitioners in the case." Carol S. Steiker & Jordan M. Steiker, *Sober Second Thoughts: Reflections on Two Decades of Constitutional Regulation of Capital Punishment*, 109 Harv. L. Rev. 355, 362 (1995). "Each of the five Justices in the majority then appended his own opinion, none of which was joined by any other Justice. Each of the four dissenters wrote his own opinion as well, although some of them joined in each other's dissents." *Id.* Because each Justice wrote separately, *Furman* is a case of unusual, if not overwhelming, complexity.

**{185}** Scholarship points out that "identifying the 'concerns' of *Furman* is a daunting task." Steiker, *supra,* 362. Any reader who picks up the opinion will see the truth of this immediately. The various "opinions present[] a staggering array of arguments for and against the constitutionality of the death penalty and offer[] little means, aside from shrewd political prediction, of determining which arguments would dominate in the decision of any future cases." *Id.* One writer suggests that *Furman* "so starkly deviated from the traditional format that it can be characterized as a decision in which there was not only no Court opinion but no Court—only a confederation of individual, even separately sovereign, Justices." Burt, *supra*, at 1758. The Justices themselves later acknowledged that "the variety of opinions supporting the judgment in *Furman* engendered confusion as to what was required in order to impose the death penalty in accord with the Eighth Amendment." *Lockett v. Ohio*, 438 U.S. 586, 599 (1978) (Burger, J.). This is not to say, however, that we cannot discern from *Furman* a central proposition of law.

**{186}** Several of the Justices concurring in *Furman* pointed to statistics that showed that the death penalty was being applied on racial lines and with pronounced frequency on black defendants. 408 U.S. at 249-50 (Douglas, J., concurring); *id.* at 310 (Stewart, J., concurring); *id.* at 364 (Marshall, J., concurring); *see generally* Samuel R. Gross and Robert Mauro, *Patterns of Death: An Analysis of Racial Disparities in Capital Sentencing and Homicide Victimization*, 37 Stan. L. Rev. 27, 31-32 (1984). While this point of agreement is significant, it is not the main point of agreement in *Furman*. The main point of agreement between the concurring Justices was, as the Court later clarified, that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Zant v. Stephens*, 462 U.S. 862, 874 (1983) (internal quotation marks and citation omitted). Put slightly differently, "the unequivocal point of unison was that the death penalty was so arbitrary in its application, so as to render cruel and unusual any death sentence imposed under the existing system." Lucy Adams, *Death by Discretion: Who Decides Who Lives and Dies in the United States of America?*, 32 Am. J. Crim. L. 381, 383–84 (2005). This holding effectively put an end to capital punishment in the United States. But this was only temporary.

**{187}** In the wake of and in reaction to *Furman*, thirty-five state legislatures amended and then reenacted their death-penalty statutes. Burt, *supra*, at 1765. To some of the Justices concurring in *Furman*, this reenactment came as a surprise. Burt, *supra*, at 1766-67. These events prompted Marshall to openly question whether the American public was in fact an "*informed* citizenry." *Gregg v. Georgia*, 428 U.S. 227, 232 (1976) (Marshall, J., dissenting). The constitutionality of these reenacted capital statutes was considered by the Court in five companion cases: *Gregg*; *Proffitt v. Florida*, 428 U.S. 242 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976); *Woodson v. North Carolina*, 428 U.S. 280 (1976); and *Roberts v. Louisiana*, 428 U.S. 325 (1976). All were issued on the same day. Burt, *supra*, at 1765. The resolutions reached in these cases constituted an abrupt about-face. See *id.* at 1751. *Furman*, it turns out, "was short-lived; . . . the Court effectively reversed direction." *Id.*

**{188}** "Unlike *Furman*, each of the Justices did not speak or vote alone [in *Gregg* and its companion cases]. As in *Furman*, however, there was no Court at work. The judgments resulted from an aggregation of plurality voting lacking any majority rationale to explain the different outcomes in these cases." Burt, *supra*, at 1765. Yet, an outcome was produced.

**{189}** "[T]he Georgia [(*Gregg*)], Florida [(*Profitt*)], and Texas [(*Jurek*)] statutes that specified various substantive standards for jury discretion" were upheld and "the North Carolina [(*Woodson*)] and Louisiana [(*Roberts*)] statutes that purported to abolish jury discretion by mandating death as the penalty for specific criminal offenses" were invalidated. Burt, *supra*, at 1765. "*Gregg* and its accompanying quartet clarified that the death penalty was not per se invalid under the Eighth Amendment and that the Court would now be involved in the ongoing business of determining which state schemes could pass constitutional muster." Steiker, *supra*, at 363. "The *Gregg*, *Proffitt*, and *Jurek* opinions did not attempt to list in any definitive fashion the prerequisites for a valid capital punishment regime; rather, they simply upheld each particular scheme presented on the basis of its own peculiar mix of procedural protections." Steiker, *supra*, at 363. Whether comparative proportionality was such a prerequisite was eventually litigated in *Pulley*.

**{190}** Unlike *Furman* and *Gregg*, *Pulley* garnered a six-justice majority opinion by Justice White. 465 U.S. at 38. Justice Stephens concurred in part and concurred in judgment, *id.* at 54, and Justices Brennan and Marshall dissented, restating their foundational objections to the death penalty, principal among them that the penalty is imposed and exacted along racial lines. *Id.* at 65. The defendant in *Pulley*, a California resident, was convicted of a capital crime, sentenced to death, and argued on appeal that California's capital punishment statute was unconstitutional as it did not provide for comparative proportionality review. *Id.* at 38-39. The Court rejected this assertion and held that California's capital punishment statute ensured that death sentences in California were not arbitrarily imposed, despite the fact that comparative proportionality review was not required. *Id.* at 48-51. The Court offered the following explanation for this conclusion.

**{191}** The Court examined the line of cases beginning with *Furman* and emphasized that those cases simply did not require comparative proportionality review to ensure that death sentences are not arbitrarily imposed. *Pulley*, 465 U.S. at 44-51. Rather the check on arbitrariness, the Court explained, was principally provided by a host of different mechanisms including: the bifurcation of trial and sentencing proceedings in the capital context; a limitation on crimes that may serve as death eligible offenses; and the requirement that juries consider aggravating and mitigating circumstances when deciding whether to impose a death sentence. *Id.* The Court also showed how in each of the capital cases preceding *Pulley* it was evident that the existence of comparative proportionality review was at maximum an optional, "additional safeguard[,]" 465 U.S. at 45, and at minimum "constitutionally superfluous." *Id.* at 49. The Court stressed that the suggestion that comparative proportionality was constitutionally required to ensure symmetry in capital sentencing was not only incorrect but suggested a misunderstanding of the import of *Furman*.

> Any capital sentencing scheme may occasionally produce aberrational outcomes. Such inconsistencies are a far cry from the major systemic defects identified in *Furman*. As we have acknowledged in the past, there can be no perfect procedure for deciding in which cases governmental authority should be used to impose death.

*Pulley*, 465 U.S. at 54 (internal quotation marks and citations omitted). This point was, in fact, a position Justice White articulated in a slightly different way eight years earlier in *Gregg,* 428 U.S. at 225-26 (White, J., concurring in judgment).

**{192}** There, Justice White rejected the contention, in broad and sweeping language, that capital sentencing must be carried out with perfect symmetry or not at all. I reproduce his words in their entirety as they have a force that is difficult to replicate.

> [The] argument that there is an unconstitutional amount of discretion in the system which separates those suspects who receive the death penalty from those who receive life imprisonment, a lesser penalty, or are acquitted or never charged, seems to be in final analysis an indictment of our entire system of justice. Petitioner has argued, in effect, that no matter how effective the death penalty may be as a punishment, government, created and run as it must be by humans, is inevitably incompetent to administer it. This cannot be accepted as a proposition of constitutional law. Imposition of the death penalty is surely an awesome responsibility for any system of justice and those who participate in it. Mistakes will be made and discriminations will occur which will be difficult to explain. However, one of society's most basic tasks is that of protecting the lives of its citizens and one of the most basic ways in which it achieves the task is through criminal laws against murder. I decline to interfere with the manner in which Georgia has chosen to enforce such laws on what is simply an assertion of lack of faith in the ability of the system of justice to operate in a fundamentally fair manner.

*Id.* In the last of the cases we need consider, *McCleskey v. Kemp*, 481 U.S. 279 (1987), the Court reiterated that sentencing disparities in the capital context do not necessarily render the death penalty unconstitutional.

**{193}** The defendant in *McCleskey*—a black, male, resident of Georgia—was sentenced to death for murdering a white police officer in the course of a robbery. *Id.* at 283. In a habeas petition challenging his conviction, the defendant submitted a sophisticated and rigorous statistical study establishing that black defendants in Georgia are, on the whole, more likely to be sentenced to death than white defendants and that this likelihood increases even further when the victim is white. *Id.* at 286-87. The defendant claimed that this state of affairs rendered the Georgia death-penalty statute unconstitutional on equal protection and Eighth Amendment grounds. *Id.* at 291, 299. The Court rejected both arguments, *id.* at 299, 308-19, and rejected the Eighth Amendment claim with language that has unquestionable significance here.

**{194}** The Court understood the defendant to be arguing that his death sentence violated the Eighth Amendment because it was "disproportionate to the sentences in other murder cases[,]" *id.* at 306, and responded to this claim with three points. First, the Georgia Supreme Court had already concluded that the defendant's death sentence "was not disproportionate to other death sentences" and supported this conclusion with citation to several "cases involving generally similar murders." *Id.* Second, *Pulley* made clear that, "where the statutory procedures adequately channel the sentencer's discretion, such proportionality review is not constitutionally required." *McCleskey*, 481 U.S. at 306 (citing *Pulley*, 465 U.S. at 50-51). Third, a defendant could not "prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty." *Id.* at 306-07. The Court explained that "'[n]othing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution.'" *Id.* at 307 (quoting *Gregg*, 428 U.S. at 199). The Court went on to clarify and expand upon this last point.

**{195}** The Court explained that "*Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Id.* The Court then observed that the Georgia sentencing procedures from which McCleskey's sentence arose did adequately focus the sentencing authority's discretion. *Id.* at 308. The Court accepted the fact that divergent sentencing outcomes in the capital sentencing context were inevitable, *id.* at 309-12, identified the varying factors that made this so, *id.* at 307-08 n.28, 311-12, and was unwilling to treat the racial disparities McCleskey's statistical study demonstrated as proof of unconstitutional prejudice against black defendants. *Id.* at 309. The mere fact that juries in the capital context will reach divergent conclusions, the Court stated, is no basis to question the validity of those judgments. *Id.* at 311. Why one jury would, in a particular case, impose death and another show mercy, the Court stated, probed into areas of human judgment that need not and cannot be explained.

Individual jurors bring to their deliberations qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. The capital sentencing decision requires the individual jurors to focus their collective judgment on the unique characteristics of a particular criminal defendant. It is not surprising that such collective judgments often are difficult to explain. But the inherent lack of predictability of jury decisions does not justify their condemnation. On the contrary, it is the jury's function to make the difficult and uniquely human judgments that defy codification and that buil[d] discretion, equity, and flexibility into a legal system.

*Id.* (alteration in original) (internal quotation marks and citations omitted). Having concluded a survey of the relevant Supreme Court case law, we are now in a much better position to examine the Majority's claim that the federal constitution requires us to revisit *Garcia* and reconsider the comparative proportionality of Fry's and Allen's death sentences.

**{196}** The Majority cannot contend that the need to engage in the comparative proportionality review they suggest is necessary derives from the "promise" of the federal constitution. Where proportionality review need not be conducted to satisfy the constitution, it cannot be that a death sentence is unconstitutional because of some claimed failure to conduct meaningful enough statutory comparative proportionality review. In addition, the contention that Fry and Allen have been subjected to unconstitutionally arbitrary death sentences because of allegedly inadequate comparative proportionality review entirely ignores the fact that Fry and Allen are members of a select and specific cadre of murderers that may, under the CFSA, ever be permissibly put to death, and that Fry's and Allen's juries were only permitted to impose death sentences after Fry and Allen received the many procedural protections assured them by the CFSA. In other words, the Majority makes such a monolith of comparative proportionality review that they effectively ignore the many limiting and channeling functions of the CFSA.

### D.    Competing Forces at Work in the CFSA

**{197}** The Majority's construction of Section 31-20A-4(C)(4) seems to assume that, so long as we are assiduous enough in unearthing comparison cases and do as robust a comparative review as possible, we can be assured an objectively correct answer about the merits of a jury's capital sentencing decision will emerge. I respectfully disagree. This view ignores the tensions at work in the CFSA between the statute's requirement for individualized capital sentencing proceedings and consistent capital sentencing outcomes. These commands are at odds with one another and any construction of Section 31-20A-4(C)(4) must necessarily impose a compromise between them.

**{198}** The Majority appears to believe that these difficult tensions are resolved by the basic realization that "[c]omparative proportionality is not a question for the jury but rather is intended to serve as a check on the exercise of jury discretion in sentencing"

and that "[t]he primary focus [in assessing the comparative proportionality of a death sentence] is not on the reasonableness of the jury's sentence of death, but rather on how that sentence compares to jury dispositions in comparable cases." *Maj. Op.* ¶ 77 (third alteration in original) (quoting *Papasavvas*, 790 A.2d at 827 (Stein, J., concurring)). This approach (1) wrongly diminishes the importance of individualized sentencing in the capital context, (2) overstates the efficacy and coherence of comparison as method, and (3) values consistency in the capital sentencing context over any other important and constitutionally significant concerns.

## 1. The importance of individualized sentencing in the capital context

**{199}** All of the provisions of the CFSA must be considered when construing its terms. *State v. Thompson*, 1953-NMSC-072, ¶ 9, 57 N.M. 459, 260 P.2d 370. Subsections 31-20A-1(B) and -2(B) direct that where a capital defendant is tried before a jury, that jury shall select the appropriate sentence. It is hardly surprising these provisions exist.

**{200}** "[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson,* 428 U.S. at 304 (Stewart, Powell, and Stevens, JJ. concurring). The sentencing jury asked to "choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death." *Witherspoon*, 391 U.S. at 519. "And one of the most important functions any jury can perform in making such a selection is to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment would hardly reflect [the Eighth Amendment's concern with] the evolving standards of decency that mark the progress of a maturing society." *Id.* at 519 n.15. It is inevitable that juries in the capital context will reach divergent outcomes in seemingly similar cases, and this, in and of itself, is no basis to question the validity of those judgments. *McCleskey*, 481 U.S. at 311.

**{201}** Despite the fact that the CFSA gives to sentencing juries the authority to determine whether to impose death or extend mercy, and despite the fact that this delegation of authority has a constitutional dimension and necessarily grants discretion, Section 31-20A-4(C)(4) nevertheless directs this Court to verify the correctness of the sentencing jury's determination. The problem inherent with Section 31-20A-4(C)(4) should be self-evident.

**{202}** On one hand, the constitution requires an individual assessment of the capital defendant's circumstances and crime and the CFSA ensures that this will occur by granting to juries the right to decide the propriety of capital punishment. On the other hand, Section 31-20A-4(C)(4) assumes that the facts giving rise to death sentences may be flattened for comparison and that this Court may, somehow, meaningfully judge the capital sentencing determinations of juries. I am not the first to acknowledge that

these concerns are entirely at odds with one another and present us with what appears to be an unresolvable conflict.

{203} Other courts have already recognized that comparison of capital sentences is inherently problematic given the "constitutional requirement for individualized sentencing in the imposition of death sentences," and is also inherently illogical as "that which is unique is also incommensurable." *Addison*, 7 A.3d at 1255. For these reasons, some have expressed the belief "that the entire concept of comparing death sentences is beset with so many problems that the exercise is incapable of meaningful application." Joseph T. Walsh, *The Limits of Proportionality Review in Death Penalty Cases*, 21 Del. Law. 13, 15 (2004). The experiment conducted in New Jersey over the last half-century compellingly illustrates this point and proves that comparative proportionality review is no panacea.

{204} The Majority mentions the statistical model of comparative proportionality review adopted by the New Jersey Supreme Court, *Maj. Op.* ¶ 45, but fails to note that some scholars denounce New Jersey's attempts—which have been vigorous and resource intensive—to make comparative proportionality review an empirical and scientific endeavor as nothing more than an "abject failure." Barry Latzer, *The Failure of Comparative Proportionality Review of Capital Cases (with Lessons from New Jersey)*, 64 Alb. L. Rev. 1161, 1234 (2001). The lesson to be learned from New Jersey is, according to some, one available from the exercise of common sense: "statistics can inform human judgment, not substitute for it." *Id.* The fact that comparative proportionality review is, as New Jersey teaches us, a process in which subjective, human judgment is exercised  and not one whereby objective, empirical inquiry produces an objectively correct answer is one the Majority appears to reject. They present comparative proportionality review as an objective inquiry. It is not.

{205} Comparative proportionality review "is conducted on an individual basis for each death sentence" and "[a]t its heart, . . . will always be a subjective judgment as to whether a particular death sentence fairly represents the values inherent in [any given] sentencing scheme for [the most depraved forms of] murder." *Gregory*, 427 P.3d at 637 (internal quotation marks and citation omitted). For this reason, the Majority's contention that this Court cannot inject its own subjective views about the propriety of any given death sentence—something the Majority seems to believe it is not doing— rings hollow. *See Maj. Op.* ¶ 11.

## 2.      The limitations of comparison

{206} The Majority holds out cross-case comparison as a reliable method to evaluate the merits of death sentences and suggests that consistency in outcomes of capital cases is not only desirable but required. They embrace two incorrect assumptions: first, comparing death sentences, in the way envisioned by the Majority, reliably answers whether a death sentence has been appropriately imposed; and second, any perceived inconsistency in the application of the death penalty is unacceptable. Both of these assumptions are wrong.

**{207}** The type of comparison in which the Majority engages—one that seeks to assess the correctness of death sentences by scrutinizing the facts and details of capital crimes and sentences—is inappropriate. As one court effectively and imaginatively explained, a court undertaking comparative proportionality review should not treat the endeavor as a forensic scientist would.

> [The defendant] would have us review [the comparative disproportionality of his death sentence] as a forensic scientist analyzes fingerprints, looking for a specified number of identity points. Only if one can conclusively determine that each swirl, ridge, and whorl is present in both samples is a match declared. We decline to do this. Crimes, particularly the brutal and extreme ones with which we deal in death penalty cases, are unique and cannot be matched up like so many points on a graph.

*State v. Lord*, 822 P.2d 177, 223 (Wash. 1991) *(overruled in part by State v. Schierman*, 438 P.3d 1063 (Wash. 2018). The point of the metaphor is that appellate courts cannot and should not sift through the fine details of capital crimes and the death sentences they produce and compare them. Doing this draws appellate courts into a realm they simply do not belong and provides only the most superficial assurance of the validity of a death sentence. And this point brings me back to my preliminary criticism of the language with which the Majority has described its task here. The validity of a death sentence cannot be based on our judgment about the severity of the murder that gave rise to the sentence.

**{208}** This Court does not sit in judgment of what crimes are most severe, heinous, and deserving of the death penalty. Section 31-20A-4(C)(4) cannot be construed to provide this Court that authority. To do so intrudes into an area that is reserved solely for the jury, the only entity capable of deciding what punishment is appropriate for the most severe violations of community norms. So what is the concern for courts undertaking a comparative proportionality review?

**{209}** The concern "is with alleviating the types of major systemic problems identified in *Furman*: random arbitrariness and imposition of the death sentence based on race." *Lord*, 822 P.2d at 223. "Technical inconsistencies in a line-by-line comparison cannot be equated with those core concerns." *Id.* Comparative proportionality review is simply "not intended to ensure that there can be no variation on a case-by-case basis, nor to guarantee that the death penalty is always imposed in superficially similar circumstances." *Id.*

**{210}** For these reasons, the secondary literature indicates that death sentences are overturned as comparatively disproportionate only very rarely. *See* Leigh B. Bienen, *The Proportionality Review of Capital Cases By State High Courts After Gregg: Only "The Appearance of Justice?*", 87 J. Crim. L. & Criminology 130 (1996) (surveying the states that perform comparative proportionality review and noting only a limited number of instances where death sentences were overturned as comparatively disproportionate). It is, ironically, the Majority's position in this case that is the outlier.

### 3.      Consistency at all costs

**{211}** There is no reason why a death sentence imposed upon a defendant who committed a particularly deplorable, death-eligible murder could not stand alone as a permissible death sentence despite the fact that all other death-eligible defendants received only life sentences.  The existence of a statistical outlier in no way establishes that the imposition of a death sentence is necessarily comparatively disproportionate so long as there is *some justification for that death sentence.  Garcia* seems to have embraced this very thought when it observed that a death sentence could be justified even if life sentences were normally imposed for the category of murder in which the crime producing the sentence belongs so long as there is "some justification" for that death sentence.  1983-NMSC-008, ¶ 34.

**{212}** It is difficult to see how, if our Legislature ever elected to reinstate the death penalty, any murder involving kidnapping or sexual assault could possibly be deemed not comparatively disproportionate in the wake of the Majority's opinion.  And this illuminates the point that comparative disproportionality is—if taken too far and permitted to serve as a demand for the sort of symmetry and consistency in sentencing *Pulley* and *McCleskey* made clear is neither practical nor required—the "poisoned pill" the Majority claims it is not.  *See Maj. Op.* ¶ 53 (stating that comparative proportionality review is not a "poisoned pill" designed to eliminate the death penalty in entire categories of murder, an outcome that would indeed be a "*de facto* repeal of the death penalty").

### E.      *Garcia*, Its Application in Fry's and Allen's Cases, and Stare Decisis

### 1.      *Garcia* was correctly decided

**{213}** *Garcia* construed Section 31-20A-4(C)(4) as limiting the pool of comparison cases to those "in which a defendant was convicted under the same aggravating circumstance(s) and then received *either* the death penalty *or* life imprisonment" *Garcia*, 1983-NMSC-008, ¶ 34.  The Majority takes issue with this, but I fail to see how this construction is flawed or unworkable. Two points are offered in defense of *Garcia*.

**{214}** First, Section 31-20A-4 is closely related to Georgia's death-penalty statute. Ruth Musgrave Silver, *Constitutionality of the New Mexico Capital Punishment Statute*, 11 N.M. L. Rev. 269, 286 (1981).  Georgia's statute requires that the state supreme court "obtain and preserve records of all capital cases in which the death penalty was imposed after January 1, 1970" so that "similar cases may be compared." *Id.*  The CFSA does not include a similar requirement.  Why did our Legislature not include in the CFSA a comparable provision?  It must be because our Legislature did not intend this Court to engage in the type of searching inquiry the Majority now claims Section 31-20A-4(C)(4) requires.

**{215}** Second, Section 31-20A-4(C)(4) states that the inquiry into the excessiveness or disproportionality of a death sentence is one evaluated with respect "to the penalty

imposed in similar cases" and must take into account "both the crime and the defendant."  The manner in which the statute uses the words "cases" and "crime" is suggestive.

**{216}**  Section 31-20A-4(C)(4)'s use of these two words confirms that the Legislature clearly understood they have distinct and different meanings.  *See* Norman J. Singer and Shambie Singer, 2A Sutherland Statutes and Statutory Construction § 46:6 (7th ed. 2014).  A murder "case" is a specific iteration of murder involving a specific set of facts.  This is distinct from murder as a "crime," a concept that would encompass a wide array of different types of murder cases.  Section 31-20A-4(C)(4)'s use of the phrase "similar cases" suggests that the pool of cases for comparison should be comprised of a limited number of cases closely mirroring the murder for which a defendant received the death sentence.  *Garcia* does just this.

## 2.    Application of *Garcia* in Fry's and Allen's cases

**{217}**  Review of how *Garcia* was applied in Fry's and Allen's direct appeals shows that *Garcia* sensibly construed the statutory language.  Fry's death sentence was compared with six cases.  These cases involved the aggravating circumstance of kidnapping—the aggravating factor that made Fry death eligible.  Four of the comparison cases were death sentences:  *Allen*, 2000-NMSC-002; *Clark*, 1999-NMSC-035; *Guzman*, 1984-NMSC-016; *Gilbert*, 1983-NMSC-083.  Two of the comparison cases were life sentences:  *McGuire*, 1990-NMSC-067 and *Hutchinson*, 1983-NMSC-029.  This Court was persuaded that the extremely violent nature of Fry's criminal acts, in conjunction with the horror his victim likely suffered in the process of the murder, amply supported the conclusion that Fry's death sentence was not comparatively disproportionate.  Fry's criminal acts were sufficiently similar to other cases where juries imposed death sentences and sufficiently deplorable to distinguish it from those cases where life sentences were imposed.  *See Fry*, 2006-NMSC-001, ¶ 44.

**{218}**  In *Allen*, the Court relied on the comparative proportionality analysis in *Clark* given the similarities between Clark's and Allen's crimes.  In *Clark*, this Court identified two cases where defendants received death sentences for murders involving the aggravating factors of kidnapping and murder of a witness—*Guzman*, 1984-NMSC-016 and *Gilbert*, 1983-NMSC-083—and two cases where the defendants received life sentences for murders involving these same aggravating circumstances—*McGuire*, 1990-NMSC-067 and *Hutchinson*, 1983-NMSC-029.  *Clark*, 1999-NMSC-035, ¶ 79.  Clark also received a death sentence for a murder involving these aggravating circumstances.  *Id.* ¶¶ 78, 82.  The aggravating factors of kidnapping and murder of a witness, along with the fact that Allen's victim was a child, satisfied this Court that Allen's crime was more equivalent to murders where a death sentence was imposed.  *Allen*, 2000-NMSC-002, ¶ 111.

**{219}**  There is nothing wrong or inadequate about the Court's analysis in either case.  In both instances, the Court paid appropriate deference to the respective jury

determinations while simultaneously examining death and life sentences in similar cases.

### 3. Stare decisis

**{220}** The principle of stare decisis is at its zenith when this Court is asked to reconsider the meaning of statutes where the previous interpretation was accepted by our Legislature. *United States v. Lane*, 474 U.S. 438, 460 n.1 (1986). Once litigants draw this Court into the realm of statutory construction and require us to decide the meaning of statutory language, it is thereafter the province of the Legislature to decide whether the particular meaning adopted by the Judiciary is the one actually intended by the Legislature. *Shepard v. United States*, 544 U.S. 13, 23 (2005). To short-circuit this process undoes that which the Legislature has embraced. These principles have unique significance here.

**{221}** *Garcia* has been challenged over the years and this Court has repeatedly declined to reconsider the comparative proportionality methodology adopted there. *See Fry*, 2006-NMSC-001, ¶ 45; *Allen*, 2000-NMSC-002, ¶ 111; *Clark*, 1999-NMSC-035, ¶ 73. In addition, *Garcia* was an opinion that elicited a dissenting voice. Thus, the Legislature surely understood that this Court did not unanimously agree that the language under consideration in *Garcia* had only one possible meaning. Lastly, the question under consideration in *Garcia* is not some obscure point of law relevant only to a niche area of practice. It concerns matters of the greatest possible significance and to which the public at large pays considerable attention.

**{222}** For these reasons, there can be no doubt that the Legislature was aware of the debate surrounding *Garcia* and was perfectly capable of overturning our construction of its words if they believed our construction lacking in some respect. It did not, and this failure to act has unquestionable significance. The Legislature embraced *Garcia*. The Majority rejects this conclusion, but for reasons that do not withstand scrutiny.

**{223}** The Majority states that "the Legislature's intent in adopting Section 31-20A-4(C)(4) is clear from its history, and our application of *Garcia* has not fulfilled that purpose." *Maj. Op.* ¶ 81. They cite authority stating that legislative inactivity cannot ratify a clearly erroneous interpretation of a statute. *Maj. Op.* ¶ 82. That the Majority is certain that *Garcia* was wrongly decided does nothing to change the fact that this Court has consistently affirmed *Garcia* for decades. The suggestion that legislative acquiescence has no force here because it was always plain to see that *Garcia* was wrongly decided strains credulity.

### F. Finality

**{224}** The Majority's ruling tells those convicted and sentenced under lawful proceedings later affirmed that they need never "reconcile themselves" to sentences imposed and affirmed and broadcasts to the public "that we have no confidence that the laws are administered justly." *Spalding v. Aiken*, 460 U.S. 1093, 1096-97 (1983)

(Burger, J. concurring in denial of certiorari). Moreover, it is "[o]nly with an assurance of real finality [that] the State [can] execute its moral judgment in a case. Only with real finality can the victims of crime move forward knowing the moral judgment will be carried out." *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). "To unsettle these expectations is to inflict a profound injury to the powerful and legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike." *Id.* (internal quotation marks and citations omitted). These concerns with finality are not merely academic, abstract, or hypothetical. We need only listen to victims of crime to see the truth of this point.

**{225}** In 1981, Michael Guzman abducted Colleen Bush and her friend Julie Jackson as they walked home late one night from UNM. *Guzman*, 1984-NMSC-016, ¶¶ 3-4. After abducting the women, Guzman stabbed Bush repeatedly and then raped and murdered Jackson. *Id.* ¶¶ 5-7. Bush survived the ordeal. *Id.* ¶¶ 5-6. Guzman surrendered himself to the authorities, was convicted of first-degree murder and other serious offenses, and received a death sentence that was commuted. *Id.* ¶¶ 1,8; Exec. Order No. 86-39 (Nov. 26, 1986). Some thirty years later, Guzman filed a habeas petition alleging new evidence entitled him to a new trial. A hearing on that petition was held. Ms. Bush attended that hearing and offered the following remarks:

> No one in the criminal justice process has ever asked what it's like for me, as the victim in this case, to survive the defendant's requests for new hearings over the last 25 years. . . . It is excruciating. Your honor, to go through delay after delay has been torture for me. Here we are again, with another habeas corpus petition. . . . [T]he habeas corpus procedures . . . need to be reformed to prevent continuing state-sanctioned psychological brutalization of victims of horrific crimes like myself. . . . This man kidnapped, raped and murdered my best friend, who was a kind and gentle person, and he thought he had done the same to me. As the victim of a violent crime I have rights, too. I have the right to be treated with fairness and respect for my dignity. I have the right to a timely disposition. Where is the fairness? Where is the dignity? And where is the timely disposition? This needs to stop now. Each continuance is like a knife in my heart and, your honor, I have been stabbed enough.

Leslie Linthicum, *Guzman murder case hearings reopen old wounds,* Albuquerque Journal (Aug. 1, 2013), https://www.abqjournal.com/240179/guzman-murder-case-hearings-reopen-old-wounds.html (last visited May 23, 2019). It is unnecessary to state in express terms what this Court should glean, in the present context, from this victim's agony.

## III.    CONCLUSION

**{226}** The words of Justice Brennan, made in a similar context but for different reasons, summarize my thoughts: "In my view the Court errs at all points from its premises to its conclusions." *McGautha*, 402 U.S. at 249 (Brennan, J., dissenting). The Majority

misstates the governing law and has done what our Legislature would not: repeal the death penalty in its entirety for all defendants in New Mexico. "When society promises to punish by death . . . , and then the courts fail to do so, . . . they undermine the integrity of the entire criminal justice system." *Coleman v. Balkcom*, 451 U.S. 949, 959 (Rehnquist, J., dissenting from denial of certiorari).

**{227}** For these reasons, I respectfully dissent.

**JUDITH K. NAKAMURA, Chief Justice**

**I CONCUR:**

**PETRA JIMENEZ MAES, Justice, Retired**
**Sitting by designation**